ROBERT B. SYKES (#3180)
        bob@sykesmcallisterlaw.com
RACHEL L. SYKES (#11778)
        rachel@sykesmcallisterlaw.com
SYKES McALLISTER LAW OFFICES, PLLC
311 South State Street, Suite 240
Salt Lake City, Utah   84111
Telephone  (801) 533-0222
Facsimile (801) 533-8081

KARRA J. PORTER (#5223)
        kporter@chrisjen.com
SCOTT T. EVANS (#6218)
        scott.evans@chrisjen.com
CHRISTENSEN & JENSEN, P.C.
257 East 200 South, Suite 1100
Salt Lake City, Utah 84111
Telephone (801) 323-5000
Facsimile (801) 355-3472

*Attorneys for Plaintiffs*

| UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH | |
|---|---|
| **CENTRAL DIVISION** | |
| SUSAN  HUNT, mother  and personal representative of DARRIEN  HUNT, deceased; CURTIS  HUNT; and ESTATE OF DARRIEN HUNT, by its Personal Representative Susan Hunt,<br><br>        Plaintiffs,<br><br>vs.<br><br>MATTHEW L. SCHAUERHAMER; NICHOLAS E. JUDSON; and the CITY OF SARATOGA SPRINGS, UTAH,<br><br>        Defendants. | **COMPLAINT**<br><br><br>Civil No. 2:15-cv-00001-TC<br><br><br>Judge Tena Campbell |

Plaintiffs, by and through their undersigned counsel of record, hereby complain against Defendants, and assert the following allegations in their totality and in the alternative:

## PRELIMINARY STATEMENT

The following allegations are based upon the undersigneds' understanding of information presently available. This is a civil rights action in which Plaintiffs seek relief for the Defendants' violations of the rights of Darrien Hunt, guaranteed by the United States Constitution, specifically, the Second, the Fourth, the Fifth, and/or the Fourteenth Amendments, which rights are further secured by the Civil Rights Act of 1871, codified as 42 U.S.C. § 1983 and § 1988. This action also seeks relief under the Constitution of the State of Utah, Article I, Sections 1, 7, 9, 14, and 25, to the extent applicable under the facts. This is further an action at law to redress grievances under the laws and statutes, as well as the Constitution, of the State of Utah.

Darrien Hunt, on September 10, 2014, had a right to open-carry a sword in Saratoga Springs. He was peaceful and non-threatening at all times. When the defendant officers confronted him, they improperly demanded that he surrender his sword in violation of the Second Amendment to the United States Constitution and Article I, § 6 of the Utah Constitution. When he declined to do so, they improperly used deadly force to detain him by opening fire on him. Next, they improperly used deadly force as he was fleeing, by opening fire on him. Thereafter, they again improperly

used deadly force on him by shooting him in the back while he was falling down or already down, and killing him. At the time Darrien was killed, he had already been shot several times, in each arm and in the hip. The shooting of Darrien Hunt was unlawful under rights guaranteed by the United States Constitution and the Utah Constitution, as well as being unlawful under other laws of the State of Utah.

## PARTIES

1.      Plaintiff Susan Hunt ("Susan") is a citizen of the United States and a resident of Utah County, State of Utah. Susan is the mother of Darrien Hunt, and is heir and personal representative of the Estate of Darrien Hunt.

2.      Plaintiff Curtis Hunt ("Curtis") is a citizen of the United States and a resident of the State of Virginia. Curtis is the father and heir of Darrien Hunt, deceased.

3.      Defendant City of Saratoga Springs ("Saratoga Springs") is a political subdivision of the State of Utah.

4.      At all relevant times, Defendant Matthew L. Schauerhamer ("Schauerhamer") was a police officer with the Saratoga Springs Police Department ("SSPD"). At all times alleged in this Complaint, Schauerhamer was acting within the course and scope of his employment. Plaintiffs are suing Schauerhamer in his individual capacity.

5.     At all relevant times, Defendant Nicholas E. Judson ("Judson") was a police officer with the SSPD.  At all times alleged in this Complaint, Judson and was acting within the course and scope of his employment.  Plaintiffs are suing Judson in his individual capacity.

## JURISDICTION AND VENUE

6.     This action arises under the Second, Fourth, Fifth and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. § 1983. Accordingly, the Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.  The Court has supplemental jurisdiction of Plaintiffs' state law claims under 28 U.S.C. § 1367.

7.     The claims made in this Complaint occurred and arose in Utah County, State of Utah.  Accordingly, venue is proper under 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

8.     On the morning of September 10, 2014, Darrien Hunt ("Darrien") was walking in the vicinity of 1413 North Redwood Road in the City of Saratoga Springs, Utah.

### – Darrien's Appearance and Deportment –

9.     Darrien was 22 years old on September 10, 2014.  He was 5'8" tall and weighed 147 pounds.

10.    On 9/10/14, at about 9:40 a.m., Darrien was wearing a red martial-arts style wrap shirt.  His hair was styled to include a samurai-style "bun" on the back of his head.  This bun was held in place with a brown elastic headband.

11.    Darrien was outfitted like a swordsman character in a Japanese anime series.

12.    Darrien was carrying a decorative, anime-style katana sword.  The sword had a dull metal edge and was stowed in a sheath on Darrien's back, with the strap over Darrien's left shoulder.

13.    The sword was approximately 40½ inches in total length, with a blade approximately 27½ inches long.  The sheath was approximately 29½ inches in length.

14.    Utah is an open-carry state and Darrien had a constitutional right to carry the sword.

15.    Only a few days prior to Darrien's death, the Salt Lake City "Comic Con" convention had taken place, during which numerous participants and persons enjoying "cosplay" (costume play) had openly carried various types of swords on the streets of the State's Capitol.

16.    Darrien was violating no laws by walking openly in Saratoga Springs with the sword on 9/10/14.

17.    At approximately 09:38:38, an individual who noticed Darrien walking with the sword called 911.  The caller's report, in its entirety, stated:

Caller:  Hi my name is [redacted].  Um, I was calling because I'm on my way to work going northbound on Redwood Road.  Right around just a little south of the Harvest Hills area on the west side of Redwood, I saw a guy walking towards kind of the Walmart area in a red shirt, but he was carrying a samurai sword, or…. And—

Dispatch:  How many minutes ago was this?
Caller:  Oh, less than five.
Dispatch:  And he was on the west side of the road?
Caller:  Yep.  Just, like I say, walking northwest in the direction of Walmart.
Dispatch:  About how old does he look?
Caller:  Um, youngish.  Between 20 and 30 somewhere.
Dispatch:  What race was he?
Caller:  Um, he was darker skinned, so I don't know if he was black or Polynesian.
Dispatch:  About how tall was he?
Caller:  Uh, hard to say, but not overly tall.  Under six feet.
Dispatch:  About how much did he weigh, could you tell?
Caller:  He was fairly skinny, so I'd say probably 150, 160.
Dispatch:  What color hair did he have?
Caller:  Uh, black, it was kind of pulled – it was kind of Afro style, but it was kind of pulled back a little bit like a giant bun on the back of his head.
Dispatch:  And you say he had a red shirt, and what color pants?
Caller:  I didn't notice the pants.
Dispatch:  Okay, hold on one second.
Dispatch:  All right.  And your name, Sir?
Caller:  [name redacted]
Dispatch:  And a phone number an officer can call you at?
Caller:  [telephone number redacted]
Dispatch:  All right, we'll go ahead and get this out to an officer, and we'll have them go check the area.  If they have any questions they will contact you by phone.
Caller:  Sounds good, thank you.
Dispatch:  You're welcome.
Caller:  Bye.
Dispatch:  Bye-bye.

18.    The information conveyed by the 911 caller did not state a violation of criminal law by Darrien Hunt.

### – Judson's Dispatch –

19.    At approximately 09:40:23, a dispatch went out from Utah Valley Dispatch to Defendant Judson.

20.    Judson graduated from the police academy in 2013.  He had been hired by SSPD in April 2014.

21.    Judson was initially an animal control officer, but was a full time patrol officer by September 10, 2014.

22.    SSPD does not get a lot of calls, so most of Judson's shifts typically consisted of working traffic and self-initiated police work.

23.    The dispatch to Defendant Judson regarding Darrien Hunt stated, in its entirety:

> *Dispatch:  26J38, copy suspicious person?*
> *Judson:  Go ahead.*
> *Dispatch:  Near Redwood and Harvest Hills Boulevard.  Time lapse about five minutes, on the west side of the road from – there is a male walking towards WalMart with a samurai sword.  About 20 to 30 years old, possibly Polynesian.  Between 5-foot-5 and 6 foot, 150 to 160 pounds.  Black longer hair, Afro style, pulled up in a hair tie, wearing a red shirt.*
> *Judson:  Copy.  Show me now.*
> *Dispatch: At 9:40.*

### – No Violation of Law by Darrien Is Alleged –

24.    The information conveyed in the dispatch to Defendant Judson did not state a violation of criminal law by Darrien Hunt.

### – Schauerhamer's Self Dispatch –

25.    Defendant Schauerhamer was not dispatched to the scene.

26.     Schauerhamer heard the dispatch to Defendant Judson and decided to go to the scene.

27.     Schauerhamer stopped his police vehicle in the east parking lot of Cyprus Credit Union and exited his vehicle.

28.     At approximately 09:44:17, Schauerhamer advised dispatch that he and Judson were on scene.

**– <u>Peaceful, Non-Threatening Walk Past Top Stop</u> –**

29.     While walking, Darrien was listening to music through earbuds.

30.     Darrien had a "bounce" to his step, was smiling, and acknowledged the greetings of others.

31.     Darrien walked peaceably past the front doors of the Top Stop convenience store.

32.     While so walking, Darrien was non-aggressive, non-threatening, and never removed the sword from the sheath.

33.     Despite the fact that Darrien was walking peacefully and had committed no crime, Judson approached Darrien in a confrontational manner from the outset.

34.     By way of example of the confrontational manner, Judson parked his car at a "weird angle" in the parking lot rather than parking his car normally in one of

the parking stalls. Judson also began yelling at Darrien, demanding that Darrien tell him why he was carrying a sword.

35.     As Judson called out to Darrien, he realized that Darrien could not hear him due to the earbuds.

36.     At this point, i.e., Schauerhamer exiting his vehicle, and Judson calling out to Darrien in the vicinity of the Cyprus Credit Union, no reasonable suspicion existed that Darrien Hunt had committed a criminal offense.

37.     At this time, in the vicinity of the Cyprus Credit Union, no probable cause existed to detain Darrien or to believe that he had committed a crime.

38.     Neither Schauerhamer nor Judson recalled any prior negative experience with, or knowledge of, Darrien Hunt.

– <u>Scene 1 Facts</u> –

39.     The Utah County Attorney investigation designated three scenes to the events that culminated with the shooting of Darrien Hunt on 9/10/14.  The three scenes were as follows:

| | | |
|---|---|---|
| Scene 1 - | **<u>Cyprus Credit Union</u>.** | The events that took place just east of the Credit Union during discussions between Officers Schauerhamer and Judson and Darrien Hunt. |
| Scene 2 - | **<u>Path to Panda Express</u>.** | The events that took place as Darrien Hunt ran from the officers, northwest of the Top Stop, south of the Panda Express, and immediately east of the Panda Express. |
| Scene 3 - | **<u>North Side of Panda</u>.** | The events that took place on the north side of the Panda Express, which included the shooting of Darrien Hunt. |

40.     Defendants Schauerhamer and Judson formed a tactical "L" stance: Schauerhamer stood to Darrien's right, next to the front driver's side door of his vehicle, while Judson stood to Darrien's left, on the passenger side at the front of the vehicle.

41.     Below is a photograph of Defendants Schauerhamer and Judson speaking with Darrien, with Schauerhamer and his vehicle on the left and Judson on the right:



42.     Darrien Hunt is smiling in this photo.

43.     This photo was taken by witness Jocelyn Hansen from the Top Stop parking lot, moments before the first shots were fired.

44.     **Jocelyn Hansen** wrote a witness statement shortly after the event which recounted her observations while sitting in her car at the Top Stop parking lot:

> ... I noticed a young man (early twenties, red silk shirt, black afro hair, light black/brown skin) walking casually in front of the Top Stop between my car and the front of the store.  He seemed relaxed; he was listening to music (had his ear buds in) and was looking around but didn't seem anxious.  He did not go into the Top Stop but continued to walk casually west past the gas station & the garage entrance to the car wash nearby (next to the gas station).
>
> Soon after I saw a police officer (medium build bald, sunglasses) talking at a clip/fast pace on the same side walk past my car in front of the Top Stop and he was talking & signaling something to someone behind me.  I looked out the back window of my van & saw a police car slowly driving west through the Top Stop parking lot.  I did not realize the two (man & officer) were a related incident.
>
> I backed out of my parking space & saw the two officers (one had exited his police car) and the other officer and they were talking to the young man in the red shirt in the next parking lot.  There was some distance between all three - 10 feet or so and they were standing on the street between an island of grass and a building.  There didn't seem to be any conflict/escalation at this time.
>
> ...
>
> Right after that I heard several shots (2 or three) and I looked toward the officers and the man & noticed the man was turning away from the police and running.  ...
>
> I quickly left the parking lot and proceeded to turn left onto Redwood Road.  As I passed the east side of the Top Stop I saw the young man in the red shirt lying on his belly on the sidewalk in front of Panda Express and the 2 officers were standing over him.
>
> Before leaving the gas station, my son said "Oh, they shoot that boy."

45.     **John Zogg** was a witness to the events at Scene 1.  He was in a car that was getting gas at the west-most pumps of the Top Stop, 40-50 feet east-southeast of Scene 1, or the place of first encounter between Darrien and Schauerhamer and Judson.  Zogg was interviewed by Detective Josh Stilson, and related the following, according to the audio interview:

> And the – the guy with the sword was smiling and ... next thing I know, I see a flash of the sword, and I – I'm not sure whether I just saw him pull it out and turn and run, or if I saw him pull it out and take a s– you know, a thrust, and he started running, and then the officer on the – that he had been talking to pull out his weapon and fired at him.  And then the other officer pulled his weapon and fired.  And that's the last I saw of the young man.  But then after he disappeared, the two officers were following him, I heard another series of shots.  And in all that time, I didn't hear anybody say "stop."

Later in that same interview, Zogg said that he did not see the thrust of the sword, but was making an assumption because of the fact that the officers were shooting. He stated:

> And I don't know what the conversation was... but I assume – I mean, I make an assumption that the guy with the sword wanted to injure the police officer, and he pulled his weapon in defense.  ...  I'll tell you when I'm making assumptions.  That fair?  ...  'Cause I didn't hear any yelling or anything like that, so it didn't seem like it was an anger situation.

Emphasis added.  Later, Zogg stated further:

> And he was carrying it low enough where I couldn't see his hands.  But I saw the flash of the sword.  And I made the assumption that he had – he had been carrying it down low, and then he pulled it out.  And it, um, and I don't know if he took a swipe at them, he lunged at them, or just pulled it out and started running.  I'm not certain.

Stilson audio interview of Zogg.

46.     Another witness, DC, penned a voluntary witness statement for the

Utah County Sheriff's Office and noted the following:

> I drove into the Chevron gas station (South Redwood Rd) & I saw a black
> kid running w/a sword and & dropped it heading into Panda Express before
> hitting the ground.  Once I saw this I turned my truck into the parking lot
> to try to prevent anything further.

47.     Witness CG reported the following:

> I was walking back to Cyprus from Top Stop.  A guy with black puffy hair,
> a red silk shirt & jeans with blue & white graphics on the pockets carrying
> a Samurai sword walked passed [sic] me.  A cop ran pass [sic] me to stop
> him and another cop in a car drove pass [sic] to stop him also.  The cop
> asked what he was doing with the sword.  The guy didn't hear him cause
> he had ear phones in.  He then took them out....

48.     Witness KZ observed the following:

> He [Officer Judson] walked passed the doors and followed the guy in the
> red shirt [Darrien].  I looked over and observed a cop car had pulled up by
> the car wash area and was getting out to talk with the boy.  There was then
> two cops total talking with him.  It looked casual.  I looked back and was
> checking on my daughter.  Next I heard gun shots.  I turned and saw the
> police officers running and shooting towards the rear of the Top Stop.  I
> heard approximately 5 shots, then about 5 seconds passed and I heard 2
> more shots.  ... The woman next to me in a van was saying, "He had a
> sword, and he swiped at the police officers." She was wearing a purple shirt
> with a purple beaded necklace I remember. I never saw a sword and any of
> the incident that lead to the shooting.

49.     While speaking with Darrien, Defendant Schauerhamer demanded

that Darrien surrender the sword to the officers.

50.     Darrien declined, stating, "No, it's my sword."

51.     At least two more times at Scene 1, Defendant Schauerhamer insisted that Darrien place the sword on Schauerhamer's vehicle. Darrien again declined.

52.     Darrien asked the officers why they were hassling him, as he had done nothing wrong. Darrien asked the officers, "Why can't I have the sword with me?"

53.     In his post-incident interview, Schauerhamer stated that he did not know whether Darrien was "crazy" or just trying to make a point about open carry with a sword.

54.     Schauerhamer knew that the police department received calls on "open carry" all the time. Schauerhamer claimed this was the first time in his experience that a subject had refused to comply with a demand by Schauerhamer to surrender his open carry weapon.

55.     Darrien was not combative or argumentative; he simply did not want to give Schauerhamer his sword.

56.     Darrien was initially nodding his head, smiling and joking with Schauerhamer and Judson at Scene 1.

57.     At one point, Darrien joked about the officer giving him a ride.

58.     Because of Darrien's (lawful) refusal to surrender the sword, Schauerhamer stated that "the hairs on the back of [his] neck were just standing on end" and he decided that "something wasn't right."

59.     In fact, Darrien was fully within his constitutional rights not to surrender the sword.

60.     While speaking with Darrien at Scene 1, Defendants Schauerhamer and Judson were several feet away from Darrien.

61.     At this particular moment, neither Schauerhamer nor Judson was within striking range of the sword.

62.     At one point, apparently at the request of the officers, Darrien removed the sheathed sword from its carrying position on his back.  The sword was sheathed until this request.

**– Conflict in Accounts Between Officers as to Swing at Scene 1 –**

63.     During his post-incident interview with the UCAO, Defendant Judson reported:

> The suspect drew the sword taking it upward over his head then swinging it toward Schauerhamer. Judson saw Schauerhamer go backward toward the ground and Judson was unsure if Schauerhamer was hit with the sword.

Sgt. Hales' Interview Report.

64.     During his post-incident interview with the UCAO investigator, Defendant Schauerhamer reported:

> As Hunt drew the sword and "jumped" at Judson, Schauerhamer drew his gun "as fast as [he] could" and fired two or three rounds....
> I asked Schauerhamer for clarification on the motion Hunt made with the sword toward Judson.  Schauerhamer explained that when Hunt "whipped" the sword out, it was all toward Judson because that's the way Hunt was facing. Schauerhamer could only describe Hunt's motion as "jumping" with

the sword toward Judson.  I asked Schauerhamer if he ever believed Hunt was going to attack him. Schauerhamer replied he was scared for himself, but he was more scared for Judson.  Schauerhamer doesn't remember stepping back or even flinching.  He just remembers trying to protect Judson.

Sgt. Johnston's Interview Report.

65.   Plaintiffs deny that Darrien swung the sword at either officer.

66.   Even if Darrien had swung the sword in the direction of an officer, it was a single motion that did not strike either officer, and was followed by Darrien immediately turning and running away from Scene 1.

67.   Darrien turned and began running away from Defendants Schauerhamer and Judson.

68.   Darrien's back was to the officers as he ran.

69.   Schauerhamer drew his handgun and fired three shots at Darrien while Darrien was running away from him.

70.   Schauerhamer fired these first three shots as fast as he could pull the trigger.

71.   Schauerhamer did not issue any warning to Darrien before firing these first three shots.

72.   Schauerhamer fired these first three shots while standing near the driver's side door of his police vehicle at Scene 1.

73.     Schauerhamer was approximately 30 to 40 feet away from Darrien when he fired these shots.

74.     A non-lethal bean bag gun was in Schauerhamer's police vehicle.

75.     Shortly after Schauerhamer began firing, Judson drew his gun and fired one shot at Scene 1.

76.     Judson was approximately 20 to 30 feet away from Darrien when he fired the shot.

77.     Judson did not issue any warning to Darrien before firing the shot.

78.     One of Schauerhamer's initial three shots went through the front driver's side windshield of a yellow Dodge Charger parked in the Cyprus Credit Union parking lot.[1]

79.     One of Schauerhamer's initial three shots struck Darrien Hunt in the back of the right upper arm, exiting from the front of the right shoulder.

80.     Schauerhamer was aware that this bullet had struck Darrien.

81.     One of Schauerhamer's initial three shots perforated Darrien's right forearm.

---

[1] Initially, investigators marked off an area that did not include the Cyprus Credit Union parking lot.  The crime scene was expanded only after an officer happened to notice a spent shell casing while he was walking to the credit union to request surveillance video.  Even then, the investigators did not find the bullet in the Dodge Charger.  The vehicle was released to its owner at approximately 16:00 hours, more than six hours after the shooting.  About ten minutes later, the owner returned and informed investigators that he had found a bullet inside the vehicle.  The bullet was in the rear window deck.

82.    Judson was also aware that Darrien had been struck by at least one of Defendant Schauerhamer's shots.

83.    Judson's shot traveled more than 300 feet, through the drive-through lane of the Panda Express to the north.  The bullet impacted the lawn on the west side of the Panda Express and then exited.

84.    Investigators searched the parking lot north of Panda Express extending north to the O'Reilly Auto Parts store, as well as the grassy area west of Panda Express, but did not find this bullet.  Investigators also did not find the shell casing for the bullet fired by Judson.

85.    Defendants allege that Schauerhamer yelled the word "Stop!" while running along the south side of Panda Express.

86.    This alleged verbalization, if it happened, would have been after Schauerhamer had fired three shots, striking Darrien twice.

87.    Schauerhamer's alleged verbalization, if it happened, would have been after Judson had fired one shot.

88.    Schauerhamer and Judson admit that no other verbalization by them occurred at any point between the first and final shots.

89.    At approximately 09:45:17, Schauerhamer notified Dispatch that shots had been fired.

## – <u>Darrien Running from Scene 1</u> –

90.    Darrien was now running for his life, running from the two men shooting at him.

91.    While running away, Darrien passed by or ran in the opposite direction from at least four businesses:

      **a.**    First, Darrien ran in a north and easterly direction away from the Cyprus Credit Union.  He did not attempt to enter the credit union.

      **b.**    Darren then continued to run in an easterly direction, behind and away from the Top Stop.   He did not attempt to enter the Top Stop.

      **c.**    Darrien rounded the corner of the Panda Express and ran in a westerly direction, away from the O'Reilly Auto Parts store, which was north of the Top Stop.  He did not attempt to enter the auto parts store.

      **d.**    While running west, Darrien ran past the entrance doors of the Panda Express.  He did not attempt to enter the Panda Express.

92.    Defendant Schauerhamer's rough sketch of the path followed by Darrien is shown on the following page:



**– Scene 2 Facts –**

93.    As Schauerhamer was chasing Darrien, he was aware that Darrien was "running weird."

94.     Schauerhamer knew that Darrien's "weird" gait was either because Darrien was holding up his pants or because he had been shot.

95.     After the shooting, Judson reported that he observed that Schauerhamer reloaded his firearm as he pursued Darrien behind Top Stop, at Scene 2.

96.     While chasing Darrien at Scene 2, Schauerhamer approached the drive-through lane of the Panda Express.

97.     Schauerhamer knew that shooting at Darrien from this location would create a hazard because he would be shooting toward a congested Redwood Road. Nonetheless, Schauerhamer fired a shot at Darrien at Scene 2.

98.     By this time, Schauerhamer claimed that "everything on the sides" of him had gone "blurry."

99.     After the shooting, Schauerhamer stated that he had decided he could not let Darrien "run around with a frickin' sword."

100.    The shot fired by Schauerhamer from Scene 2 near the Panda Express drive-thru struck Darrien in the left arm.

101.    While running, at Scene 2, Darrien was carrying the sword and sheath in his right hand.  He did not have anything in his left hand.

102.    Darrien was using his left hand to try to hold up his pants.

– <u>Scene 3 Facts</u> –

103.   Darrien rounded the corner on the sidewalk next to Panda Express. This was the beginning of Scene 3.

104.   As Darrien ran west at Scene 3, the sheath flew out of Darrien's hand, landing more than 25 feet away.

105.   By this point, just past the west or second door at Panda, Darrien's pants had fallen down around his legs.

106.   Darrien dropped the sword on the sidewalk north of Panda at Scene 3, and tripped and stumbled.

107.   The sword fell 10-15 feet from Darrien's body.

108.   One or more witnesses from O'Reilly Auto Parts observed that Darrien tripped or fell to the ground because of his pants falling down around his ankles.

109.   As Darrien was stumbling or falling to the ground, Schauerhamer approached Darrien from behind at Scene 3.

110.   At this point, Schauerhamer was within 10 to 15 feet of Darrien.

111.   At this point, Darrien Hunt was stopped, helpless, and posed no threat of imminent danger to anyone.

112.   Although Judson was close behind, he had not yet rounded the corner to the north side of Panda Express and was not in a position to see what Schauerhamer was doing when Schauerhamer fired the final 3 shots at Darrien Hunt.

### – Darrien Shot While Falling or While Down –

113.   While Schauerhamer was stopped, or almost stopped, he brought up his right (gun) hand, aimed the gun, brought his left hand up to support his shooting hand, and shot Darrien three more times.

114.   Schauerhamer did not give any warning to Darrien before taking the final three shots.

115.   As discussed on pages 4-6 of the Utah Medical Examiner's amended autopsy report, two of Schauerhamer's shots struck Darrien in the hip.

116.   There were no bullet holes in Darrien's pants.  The only bullet holes in Darrien's clothing were in his shirt and his underwear.

117.   Schauerhamer knew that each of these final three shots was "good," as he described them to investigators, meaning that each bullet had struck Darrien.

### – Schauerhamer's Non-Lethal Options –

118.   When he fired the final three shots, Schauerhamer knew that a second officer, Defendant Judson, was close behind him.

119.   When he fired the final three shots, Schauerhamer knew that a report of shots fired had been issued, and that other law enforcement would shortly be arriving.

120.   In fact, a Lehi police officer was on scene less than 45 seconds later.

121.   When he fired the final three shots, Schauerhamer knew that he outweighed Darrien Hunt by more than 20 pounds.

122.   When he fired the final three shots, Schauerhamer knew that Defendant Judson outweighed Darrien Hunt by more than 20 pounds.

123.   When he fired the final three shots, Defendant Schauerhamer knew that Defendant Judson had a Taser with him.

124.   Saratoga Springs Police Department requires its officers to carry a Taser.

125.   Defendant Schauerhamer chose not to carry his assigned Taser because he claimed it gave him "cysts" on his back.

126.   Schauerhamer was not carrying his assigned Taser when he chose to join Defendant Judson on the call.

127.   When he fired the final three shots, Defendant Schauerhamer knew that he was carrying a 26" ASP telescopic (extending) baton.

128.   When he fired the final three shots, Defendant Schauerhamer knew that Defendant Judson was also carrying a 26" ASP telescopic baton.

129.   When Defendant Schauerhamer fired the final three shots, Darrien had no weapon in either hand.

130.   When the shots were fired, Darrien had no weapon within his reach.

131.   When Defendant Schauerhamer fired the final three shots, he knew that Darrien had already been shot at least twice, in the right and left arms.  (It was in fact three times.)

132.   When Defendant Schauerhamer fired the final three shots, Darrien was physically incapable of wielding a sword or running, and posed no threat of imminent danger to anyone.

133.   One of the final three shots was the fatal shot that entered Darrien's body from approximately 2 cm. to the right of his spine, and traveled in an upward direction between the back rear of Darrien's right lung and the upper front of it, according to the State Medical Examiner's autopsy report.

134.   After shooting Darrien the last three times, Schauerhamer says that everything came back into focus and "opened up again."

135.   Defendant Judson did not witness the final three shots fired by Defendant Schauerhamer.

### – Schauerhamer's Falsehoods and Cover-Up –

136.   After Darrien's death, Defendant Schauerhamer engaged in efforts to cover up his unlawful actions.  For example, Schauerhamer falsely claimed that

Darrien was running at a "dead sprint" when Schauerhamer fired the final three shots. In reality, Darrien's pants had already fallen around his legs, Darrien was stumbling and falling to the ground, and Schauerhamer was easily catching up to him.

137.   Defendant Schauerhamer also falsely claimed that Darrien was still holding the sword and the sheath when the final shots were fired.

138.   Schauerhamer also falsely claimed that he had not fired a shot toward the congested Redwood Road.

139.   After the shooting, Defendant Schauerhamer claimed that he shot Darrien to death because he was worried about people in the Wal-Mart parking lot. This was a false statement. Among other things, a) Schauerhamer had observed that Darrien was not walking toward Wal-Mart when Schauerhamer arrived on scene; b) While running, Schauerhamer had observed Darrien bypass or run away from at least four closer businesses (Cyprus Credit Union, Top Stop, O'Reilly's Auto Parts, and Panda Express), and away from the direction of Wal-Mart; c) Schauerhamer knew that Darrien had been shot at least twice already; d) Schauerhamer knew that Darrien's pants had fallen down and he had tripped; e) Schauerhamer had gained rapidly on a wounded Darrien and was only 10-15 feet away when he fired the final shots; and f) Schauerhamer knew that getting to Wal-Mart would have required Darrien to run nearly a quarter mile uphill – across the lawn west of Panda Express, a parking lot, and a detention basin – having been shot multiple times and with his pants around his legs.

## – Judson's Cover-Up –

140.   After the shooting, Defendant Judson engaged in efforts to cover up his and Defendant Schauerhamer's unlawful actions.  For example, Judson claimed that Defendant Schauerhamer shot at Darrien while Darrien was lunging at Judson with the sword over his head, and that it was after these shots that Darrien began running away.

141.   In reality, Darrien was already running away before any shots were fired, as attested to by virtually all of the witnesses.

142.   Defendant Judson was wearing a body camera at the time of the incident.  Allegedly, he did not turn it on.  On the day of the incident, investigators released the body camera to the SSPD without checking the camera.  On November 14, 2014, more than two months after Darrien Hunt's death, investigators checked Defendant Judson's body camera for the first time.  At that point, investigators found nothing on the camera other than a brief recording made September 9, 2014, the night before the incident.

## – Schauerhamer's Bullets –

143.   In total, six of Schauerhamer's shots struck Darrien Hunt:

a.      One bullet penetrated the mid right back, i.e., was a posterior entry.  This bullet entered the mid right back near the spine and traveled into the right pleural cavity, perforating his right upper and lower lung lobes with associated hemothorax, fractured the right 10th rib head and right 10th thoracic vertebra transverse

process.  The bullet continued upward into the right lung, traveling through the lower and upper lung lobes with the bullet coming to rest in the anterior upper lobe adjacent to the 5th thoracic vertebra.  The direction of fire was posterior to anterior, slightly right to left, and "upward."  This shot was one of Schauerhamer's final three shots.

        **b.**      One bullet perforated Darrien's right upper arm.  This bullet entered Darrien's body on the posterior right upper arm adjacent to the axilla.  The bullet traveled through the soft tissue of Darrien's right shoulder before exiting the front of Darrien's right shoulder slightly below his mid right clavicle (shoulder bone).  This bullet exited Darrien's body three centimeters higher than its entry point.  The direction of fire was posterior to anterior, right to left, and upward.  This bullet appears to have been one of the first three shots that Schauerhamer fired from the Cyprus Credit Union parking lot.

        **c.**      One bullet perforated Darrien's right forearm.  This bullet entered the posterior right forearm, and exited on the posterior right wrist.  In other words, after this shot, Darrien's right wrist had been shot.  The direction of fire was downward.  This bullet was one of the first three shots that Schauerhamer fired from the Cyprus Credit Union parking lot.

        **d.**      One bullet penetrated Darrien's left upper arm.  This bullet entered the medial left upper arm slightly above the elbow, i.e., a posterior entry, fracturing the distal left humerus (the long bone in the upper arm, located between the

elbow joint and the shoulder) and olecranon process of the left ulna (a long bone in the forearm). The bullet came to rest in the fractured elbow joint. The direction of fire was left to right, and slightly downward. In other words, after this shot, Darrien's left arm was broken in two places.

  e.   One bullet perforated Darrien's left hip. This bullet made a posterior entry, i.e., entering at the posterolateral (rear) left hip, traveling through subcutaneous tissue, and exiting the anterolateral (front) left hip. The direction of fire was posterior to anterior, and slightly "upward." This was one of Schauerhamer's final three shots, and did not penetrate any of Darrien's clothing.

  f.   One bullet penetrated Darrien's left hip two centimeters below the other left hip shot. This bullet fractured the greater trochanter of the left femur, where the bullet came to rest. In other words, after this shot, Darrien's left leg in the hip area was broken. The direction of fire was posterior to anterior, and slightly left to right. This was one of Schauerhamer's final three shots, and did not penetrate any of Darrien's clothing.

  144.   At no time did either Schauerhamer or Judson advise Darrien that he was under arrest, or that the officers intended to take him into custody.

  145.   At no time did either Schauerhamer or Judson tell Darrien that they would stop shooting if he stopped running.

146.   The first two shots fired by Schauerhamer that struck Darrien would not have been fatal to Darrien.  Darrien was killed by one or more of the final three shots.

## – No Controlled Substances –

147.   The Medical Examiner confirmed that Darrien had no controlled substances or alcohol in his system at the time of his death.

## – Improper and Questionable Investigation –

148.   After Darrien's death, the Utah County Attorney's Office filed an action in the Fourth Judicial District Court in Utah County titled "In the Matter of a Criminal Investigation," Case No. 141402959.

149.   In this action, the Utah County Attorney's Office Bureau of Investigation represented that a warrant was needed for potential evidence relating to an alleged crime committed by Darrien Hunt.  Among other things, the County Attorney's office used this proceeding to seek employment and cellular phone records for Darrien. The County Attorney's office knew that assault charges could not be pursued against a dead person.

150.   This affidavit was part of efforts by the County Attorney's office to assist Saratoga Springs in gathering evidence to defend itself from potential civil liability without having to go through proper channels.

151.   Co-workers of Defendants Schauerhamer and Judson from the SSPD were allowed to participate in the investigation.  For example, an SSPD officer was allowed to take charge of the Defendants' guns, ammunition, and uniforms.  Defendant Schauerhamer was allowed to look for a missing cartridge magazine.

152.   Investigating authorities interviewed various witnesses on the day of the incident.  All of these witnesses were asked by investigators to prepare a written statement before leaving.

153.   When members of Darrien's family arrived at the scene, investigators shuttled them to the SSPD to be interviewed.

154.   As part of the protocol for investigating an officer-involved shooting, the Utah County Attorney's Office detached Investigator Jeff Robinson to the scene within minutes of the shooting.  Specifically, it was at 9:54 am. when a Utah Valley Dispatcher called Robinson.

155.   Robinson immediately went to the scene, representing the Task Force to investigate officer shootings, pursuant to the protocol established in Utah County.  Between approximately 11:27 a.m. and 11:44 a.m., Robinson had overseen the drawing of blood samples from both officers, and had "met individually with Officer Judson, and then Cpl. Schauerhamer and requested they sign waivers to draw their blood and urine samples as part of the shooting investigation."

156.   Robinson requested interviews of Schauerhamer and Judson "within forty-eight hours."

157.   Defendants Schauerhamer and Judson left the SSPD on 9/10/14 without being interviewed or preparing a written statement.

158.   Within hours of Darrien Hunt's death, Schauerhamer and Judson had each obtained legal representation.

159.   The interviews of Schauerhamer and Judson did not take place until six days and eight days after the incident, respectively.

160.   Schauerhamer's patrol vehicle had a Panasonic dash camera installed.

161.   Schauerhamer claimed that the dash cam was not turned on.

162.   Had the dashcam been turned on, it would have recorded substantially all of the events at Scene 1 (the credit union).

163.   Schauerhamer had a lapel camera at the time of this incident, but he claimed it was broken, and he did not use it on 9/10/14 at Scene 1.

164.   Judson's police vehicle has video and audio recording equipment. Judson claims he did not turn them on.

165.   Judson had a lapel camera installed on his uniform.

166.   Judson later claimed that he forgot to turn on the lapel camera.

167.   Neither Schauerhamer nor Judson have been disciplined in connection with the Darrien Hunt incident.

168.   Schauerhamer's actions toward Darrien Hunt were consistent with City of Saratoga Springs policy.

169.   Judson's actions toward Darrien Hunt were consistent with City of Saratoga Springs policy.

### – Tragic Consequences and Damages –

170.   In the final moments of Darrien's life, he was compelled to flee in great terror from Schauerhamer and Judson.  He undoubtedly knew that the officers were trying to kill him, which caused him to experience fear and terror in the last, final moments of his young life.

171.   In addition to any other damages, the Estate of Darrien Hunt is entitled to pain and suffering and other general damages as may be allowed by law, in an amount that is reasonable as determined by a jury.

172.   Darrien was much beloved by his mother, Susan Hunt, and his father, Curtis Hunt, as well as by his siblings.  They have been deprived of the society and companionship of Darrien, which society and companionship they would have otherwise enjoyed for many years.  Susan and Curtis are entitled to an amount for loss of society and companionship that is reasonable as determined by a jury.

173.   Darrien's siblings may also, under some circumstances, be entitled to compensation for Darrien's loss.

174.   The actions of Defendant Schauerhamer were the result of willful and malicious conduct, and/or manifested a knowing and reckless indifference toward, and a disregard of, the rights and very life of others.

## CLAIMS FOR RELIEF

175.   The headings stated under each individual cause of action are for general descriptive purposes only, and are not intended to limit the Plaintiffs' claims for relief.  The Plaintiffs reserve the right to assert any legal theory or claim for relief applicable to the facts set forth in this Complaint or an amended complaint pursuant to F.R.Civ.P. 8.

176.   The claims for relief asserted herein are asserted individually and/or in the alternative.

## FIRST CLAIM FOR RELIEF

*Deprivation of Federal Constitutional Rights – 42 U.S.C. § 1983*
*Against Defendant Schauerhamer*

177.   Plaintiffs incorporate by reference all other paragraphs of this Complaint as though fully set forth herein.

178.   At all times relevant hereto, and in performance of the acts set forth herein, Defendant Schauerhamer acted under color of state law.

179.   At all times relevant hereto, and in performance of the acts set forth herein, Schauerhamer actively and personally caused the violations of constitutional rights alleged herein.

180.   Schauerhamer's conduct alleged herein, including Schauerhamer's use of unreasonable or unnecessary deadly force, subjected Darrien to the deprivation of his rights protected under the Fourth Amendment to the United States Constitution.

181.   Schauerhamer's conduct alleged herein, including (a) detaining Darrien Hunt and demanding that Darrien surrender a lawfully possessed sword, (b) retaliating against Darrien for choosing not to comply with the unlawful demand, and (3) shooting Darrien Hunt because Schauerhamer "wasn't going to let someone run around with a frickin' sword," violated Darrien's rights under the Second Amendment to the United States Constitution.

182.   If, under the facts, Darrien Hunt is not deemed to have been "seized" under the *Graham* factors relating to the Fourth Amendment, and not deemed to be in custody, then Defendant Schauerhamer's actions deprived him of life, liberty, and bodily integrity, as substantively guaranteed to Darrien Hunt under the Fifth and Fourteenth Amendments.

183.   The unreasonable, excessive, and dangerous deadly force used by Defendant Schauerhamer, which directly caused Darrien Hunt's death as described above, deprived him of a liberty interest without due process of law, in violation of the Fifth and/or Fourteenth Amendments of the U.S. Constitution.

184.   Schauerhamer's actions violated Darrien's clearly established constitutional rights of which reasonable police officers are or should be aware.

-35-

185.   Defendant Schauerhamer's actions proximately caused pain and emotional distress to Darrien.

186.   Defendant Schauerhamer's actions proximately caused Darrien's death and the harm alleged by Plaintiffs.

187.   As a result of Defendant Schauerhamer's unlawful actions, and to remedy misconduct of significant importance to the public, Plaintiffs have had to retain counsel.

188.   Schauerhamer's actions manifested malicious, reckless, and callous indifference to the rights and the very life of Darrien Hunt.

## SECOND CLAIM FOR RELIEF

*Deprivation of Federal Constitutional Rights – 42 U.S.C. § 1983*
*Against Defendant* <u>*Judson*</u>

189.   Plaintiffs incorporate by reference all other paragraphs of this Complaint as though fully set forth herein.

190.   At all times relevant hereto, and in performance of the acts set forth herein, Defendant Judson acted under color of state law.

191.   At all times relevant hereto, and in performance of the acts set forth herein, Defendant Judson actively and personally caused the violations of constitutional rights alleged herein.

192.   Defendant Judson's conduct alleged herein, including (a) detaining Darrien Hunt and demanding that Darrien surrender a lawfully possessed sword, and (b)

retaliating against Darrien for choosing not to comply with the unlawful demand, violated Darrien's rights under the Second Amendment to the United States Constitution.

193.   Defendant Judson's conduct alleged herein, including his unlawful detention of Darrien Hunt, and his participation in and failure to prevent the violations of Darrien's rights in his presence by Defendant Schauerhamer, violated Darrien's rights under the Fourth Amendment to the United States Constitution.

194.   Defendant Judson's conduct alleged herein, including his unlawful act of shooting at Darrien Hunt as described above, subjected Darrien to the deprivation of his rights to liberty and due process of law under the Fifth and Fourteenth Amendments to the United States Constitution.  Among other things, Defendant Judson unlawfully shot at, chased, and terrorized Darrien Hunt, leading and contributing to his death at the hands of Defendant Schauerhamer.

195.   Defendant Judson's actions violated Darrien's clearly established constitutional rights of which reasonable police officers are or should be aware.

196.   Defendant Judson's actions proximately caused pain and emotional distress to Darrien.

197.   Defendant Judson's actions proximately caused Darrien's death and the harm alleged by Plaintiffs.

198.   As a result of Defendant Judson's unlawful actions, and to remedy misconduct of significant importance to the public, Plaintiffs have had to retain counsel.

199.   Judson's actions manifested malicious, reckless, and callous indifference to the rights and the very life of Darrien Hunt.

### THIRD CLAIM FOR RELIEF

*Deprivation of Federal Constitutional Rights – 42 U.S.C. § 1983*
*Against Defendant Saratoga Springs*

200.   Plaintiffs incorporate by reference all other paragraphs of this Complaint as though fully set forth herein.

201.   The actions of Defendants Schauerhamer and Judson toward Darrien Hunt were pursuant to, and consistent with, an established policy, practice, or custom of Defendant Saratoga Springs.

202.   The actions of Schauerhamer and Judson were pursuant to a Saratoga Springs policy, practice, or custom that consists of arming police officers with deadly weapons and condoning their use without requiring the consideration of less-lethal alternatives, and without providing proper training and/or supervision regarding their safe, reasonable, and appropriate use.

203.   Defendant Saratoga Springs was deliberately indifferent toward the proper training, arming, and supervision of its employees and agents.

204.   The actions of Defendant Saratoga Springs were the proximate cause of pain and suffering to Darrien Hunt, the death of Darrien, and the other damages sustained by Plaintiffs.

205.   As a result of Defendant Saratoga Springs' actions, and in order to remedy this important issue of public concern, Plaintiffs have had to retain legal counsel.

## FOURTH CLAIM FOR RELIEF

*Violations of Utah Constitution, Art. I, §§ 1,6, 7, 14, 25*
*Against All Defendants*

206.   Plaintiffs incorporate by reference all other paragraphs of this Complaint as though fully set forth herein.

207.   The actions of Defendants described herein violated Darrien Hunt's rights secured by Article I, Section 1 of the Utah Constitution ("All men have the inherent and inalienable right to enjoy and defend their lives and liberties; to acquire, possess and protect property[.]").

208.   The actions of Defendants described herein violated Darrien Hunt's rights secured by Article I, Section 6 of the Utah Constitution ("The individual right of the people to keep and bear arms for security and defense of self, family, others, property, or the state, as well as for other lawful purposes shall not be infringed[.]")

209.   The actions of Defendants described above violated Plaintiffs' rights secured by  Article I, Section 7 of the Constitution of the State of Utah ("No person shall be deprived of life, liberty or property, without due process of law.").

210.     The actions of Defendants described herein violated Plaintiffs' rights secured by Article I, Section 14, which states in relevant part: "The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated."

211.     The actions of Defendants described herein violated Plaintiffs' rights secured by Article I, Section 25, which states in relevant part: "This enumeration of rights shall not be construed to impair or deny others retained by the people."

212.     Based upon the text and historical context, case law, and other considerations, the protections and rights afforded by Article I, §§ 1, 6, 7, 14, and 25 are broader than the interests and rights afforded by the United States Constitution.

213.     Defendants' actions described herein amount to flagrant violations of the Plaintiffs' rights under the Utah Constitution.

214.     There is no other adequate state law remedy for these violations.

215.     Injunctive relief cannot redress Plaintiffs' injuries.

216.     Defendants' actions as alleged herein were the proximate cause of pain and suffering to Darrien, to Darrien's death, and to the damages sustained by Plaintiffs.

217.     In order to remedy Defendants' unconstitutional conduct, Plaintiffs have had to retain counsel.

### *FIFTH CLAIM FOR RELIEF*
*(Informational at the Present Time)*

*Intentional Infliction of Emotional Distress*
*Against Defendant Schauerhamer*

218.  Plaintiffs incorporate by reference all other paragraphs of this Complaint as though fully set forth herein.

219.  These allegations are informational at the present time.  Under Utah law, Plaintiffs are required to provide notice of causes of action against a governmental entity, beginning with a notice of claim, which will occur, or has occurred, shortly.  The governmental entity thereafter has 60 days in which to respond.  It is anticipated that no response will be made or that this claim will be denied, after which Plaintiffs will seek to add the Fifth and Sixth Claims for Relief as official causes of action, and will do so by the amending process under the Federal Rules of Civil Procedure.  Therefore, both the Fifth and Sixth Claims for Relief are for informational purposes only and do not require an answer at this time, but are provided now to assist the Defendants and the Court in knowing what is coming in the future.

220.  Defendant Schauerhamer's intentional and/or reckless actions as described above constituted outrageous conduct under the circumstances.

221.  Schauerhamer's actions offended generally accepted standards of decency and morality.

222.   Any reasonable person would have known that the intentional and/or reckless actions of Defendant Schauerhamer would result in severe emotional distress to Darrien Hunt's parents.

223.   Darrien's parents have in fact suffered such emotional distress.

### SIXTH CLAIM FOR RELIEF
*(Informational at the Present Time)*

*Willful Misconduct/Wrongful Death*
*Against Defendant Schauerhamer*

224.   Plaintiffs incorporate by reference all other paragraphs of this Complaint as though fully set forth herein.

225.   Defendant Schauerhamer acted, or failed to act, through willful misconduct that resulted in the wrongful death of Darrien, by, among other things, acting with the intent to cause an unconsented harmful and/or offensive contact to Darrien.

226.   Defendant Schauerhamer did in fact commit such unconsented harmful and/or offensive contact against Darrien that resulted in Darrien's death and other harm to Plaintiffs.

## COMPLIANCE WITH GOVERNMENTAL IMMUNITY ACT OF UTAH

227.   Plaintiffs' constitutional claims are not subject to the provisions of the Utah Governmental Immunity Act.

228.   With respect to the Fifth and Sixth Claims for Relief, Plaintiffs have complied with applicable provisions of the Governmental Immunity Act of Utah, U.C.A. § 63G-7-101, et seq., and have provided a Notice of Claim to Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.   A declaration and judgment that the actions of Defendants Schauerhamer and Judson, and Defendant Saratoga Springs' policies and customs regarding the use of lethal force, are and were unconstitutional;

2.   Economic and noneconomic damages as provided under applicable law and deemed appropriate by a jury;

3.   Attorney fees and litigation expenses pursuant to 42 U.S.C. § 1988, Utah law, and equity, to the full extent provided under applicable law;

4.   Punitive damages against Defendant Schauerhamer, as provided under applicable law and to the extent deemed appropriate by a jury;

5.   Costs as provided under applicable law;

6.   Pre-judgment and post-judgment interest as provided under applicable law.

7.   All other equitable relief deemed just and appropriate by the Court, including an order (a) requiring Saratoga Springs to equip its law enforcement officers with body cameras while on patrol, (b) requiring Saratoga Springs' law enforcement

officers to carry non-lethal as well as lethal weapons while on patrol, (c) to provide training regarding the use of lethal force, and (d) to implement other training, supervision, and policies required to meet federal and state constitutional requirements.

DATED this 2nd day of January, 2015.

**SYKES McALLISTER LAW OFFICES, PLLC**

 /s/  *Robert B. Sykes*
ROBERT B. SYKES
RACHEL L. SYKES
*Attorneys for Susan Hunt*

**CHRISTENSEN & JENSEN, P.C.**

 /s/  *Karra J. Porter*
KARRA J. PORTER
SCOTT T. EVANS
*Attorneys for Curtis Hunt*

Q:\CLIENT\3020.HUNT\2. P2.1 CASE\141229.Hunt Complaint.finalsw.judge.wpd

-44-