Robert B. Sykes (#3180)
**SYKES MCALLISTER LAW OFFICES, PLLC**
311 S. State Street, Suite 240
Salt Lake City, Utah 84111
Telephone No. (801) 533-0222
bob@sykesmcallisterlaw.com
*Seeking a Withdrawal as*
*Attorneys for Plaintiff Susan Hunt*
*and the Estate of Darrien Hunt*

# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| SUSAN HUNT, mother and personal representative of DARRIEN HUNT, deceased; CURTIS HUNT; and ESTATE OF DARRIEN HUNT, by its Personal Representative Susan Hunt, | **RESPONSE TO SUSAN HUNT'S OPPOSITION TO ATTORNEY'S LIEN** |
| Plaintiffs, | Civil No. 2:15-cv-00001-TC |
| vs. | Judge Tena Campbell |
| MATTHEW L. SCHAUERHAMER; NICHOLAS E. JUDSON; and the CITY OF SARATOGA SPRINGS, UTAH, | *(Filed under Seal on Tuesday, 11/10/15)* |
| Defendants. | |

This is the Response of Robert B. Sykes and his law firm, Sykes McAllister Law Offices, PLLC, (SMLO) and all their attorneys, to the "Opposition to ... Attorney's Lien" [Doc 24] filed by Paul Lydolph III on behalf of Susan Hunt.

# INTRODUCTION & SUMMARY

### ~ "High-Volume Zero-Substance Affront" ~

After reading Mr. Lydolph's "Opposition," 27 pages of false statements, scandalous allegations, and personal invective, one hardly knows where to start.  There is nothing true in this Opposition that makes a difference.  It is 100% erroneous.  As such, it is tempting to engage, and present the truth in response to each false allegation.  But that would be pointless and waste the Court's time, since much of the Opposition is irrelevant to the two main issues.  So, as to the bulk of the Opposition [Doc. 23], we adopt Defendants' characterization of it as "a high-volume, zero-substance affront to both the evidence and the law." [Doc. 25.]

This Response will focus on the two real issues:  **(1) Did Susan Hunt agree to settle** the case for $900,000, together with robust non-disparagement provisions?  **(2)** Did Susan Hunt **instruct Robert Sykes to communicate that acceptance** to Defendants?  **"Yes"** is the answer to both queries.

# STATEMENT OF CONCERN

Attorney Bob Sykes has enormous compassion for the plight of Susan Hunt.  No mother should have to bury her son under these circumstances.  He believes the controversy that has forced this Response is unfortunate.

# STATEMENT OF FACTS

## *Three Key Facts*

Three (3) "key facts" are most important to upholding the attorney's lien:

1.      **Agreed to $900,000.**  In an email dated July 8, 2015, Susan Hunt stated that she would accept "850,000 to 900,000" dollars to settle the case. Exhibit 1.

2.      **Agreed to Robust Non-Disparagement.**  On August 12, 2015 at 3:41 pm, Susan Hunt was told by email that the settlement "boil[ed] down" to whether she "want[ed] the freedom to say what you want to say," or "whether you want to settle and get the money."  Exhibit 2.  Less than two (2) hours later, at 5:06 pm, she orally affirmed in a tape recorded conversation that she "would go ahead and sign it with that [non-disparagement] clause in there."  Exhibit 3.

3.      **Communicated to Defendants.**  Susan Hunt agreed to have her acceptance communicated to Defendants because she agreed "to sign a deal tomorrow or Monday," and she was "available tomorrow to come down." Exhibit 3; Exhibit 4:45 ("Uh, yes, I am"). By the time of the 8/12/15 5:06 pm conversation, Susan Hunt had received the draft Release with the extensive non-disparagement provisions (Exhibit 4:33.1, 33.2), and had received initial drafts of the Press Release. Exhibits 4:32, 34, 34(a), 35, and 44.

## *General  Facts*

The following facts are important to understanding the context of the settlement:

4.      **Long-Time Settlement Efforts.**  Settlement efforts on this case began shortly after SMLO was hired, in October-December 2014.  Settlement letters were sent to the adjuster,

Christopher Duffy, with the approval of and copied to Susan Hunt. *See* Exhibit 6, letters to Duffy.

Settlement was rejected by Defendants at that time. *Id.*

        **5.**     **Falsehoods in the Opposition.** There are a legion of false statements in the

Opposition filed by Mr. Lydolph. Many of these deal with requests allegedly not made in the

Complaint, or various things otherwise not done. Since these are peripheral issues, they will not be

addressed in this Response unless the Court so requests, with just one exception. *See* Fact 6.

        **6.**     **Not Settled for 13.8% of the Value.** Ms. Hunt's new attorney claims

multiple times that the case was settled for only 13.8% of its value, using the cases of Eric Garner

(New York), Freddie Gray (Baltimore), and Walter Scott (South Carolina) as proof. *See* Doc. 24,

p. 2. This is categorically false. These allegations omit many serious differences in these cases that

were relevant to settlement, and make Mr. Lydolph's comparison blatantly misleading. For example,

there was good video of the improper force and shooting, respectively, in Garner (New York) and

Scott (South Carolina). And there was good video of Freddie Gray (Baltimore) walking, apparently

in good health, to the police wagon. The video in Garner shows him being choked in violation of

police procedures. Scott's video shows him running from a police officer, and about 40 feet away,

when he was shot in the back. There are no such videos in the Hunt case. Furthermore, Garner,

Gray and Scott **are not claimed to have used a weapon.** Darrien had a weapon, i.e., a Samurai

sword. And there are two independent witness statements, aside from the officers, claiming Darrien

"swung"[1] the sword at the officers. These statements were signed by witnesses on the day of the

---

[1] *See* Witness Statements of Melody Wride and John Zogg, attached as Exhibit 7. John Zogg informally later backed off of this statement, but on the day of the event he signed a statement saying that Darrien swung the sword.

event. Exhibit 8. These were part of the 53 GB of discovery produced by the Utah County Attorney's Office in November 2014. Exhibit 7. Additionally, law enforcement authorities charged officers in the Scott and Gray cases with murder, while Defendants in the Hunt case were cleared of wrongful doing by the Utah County Attorney. Facts in these three cases are not comparable to the facts in Hunt.

       7.    **Arbitration With Curtis Hunt.** From the beginning of the association between Karra Porter (for Curtis Hunt) and Robert Sykes (for Susan Hunt) in October 2014, there was an oral agreement to do a binding arbitration of the division of any possible settlement proceeds between Curtis Hunt and Susan Hunt. This was reaffirmed by several letters. *See* Exhibit 4:46,47 as an example. Susan Hunt was preparing for the arbitration by providing data. Exhibit 4:51 (redacted for privacy). No percentage division had been agreed to by the parties as of 8/18/15, and the binding arbitration was to take place after the money was received. Exhibit 4:46,47.

       8.    **Mediation.** A day-long mediation, conducted by well-known mediator Paul Felt, was held on June 18, 2015, to attempt settlement. Present were Susan Hunt and her two sisters, Cindy Moss and Barbe Huston, acting as her advisors. Exhibit 4:1, 2. Curtis Hunt was available electronically and his counsel, Karra Porter, was present. The case did not settle at mediation.

       9.    **Ms. Hunt Agreed to Settle for $900,000.** After the mediation terminated, there were significant post-mediation settlement attempts in June, July and early August. Exhibit 4:6.2,7,15-18,20-21. Eventually, on August 3, 2015, Defendants conditionally offered to settle for $900,000. Exhibits 12; 4:6,33.1. This $900,000 offer from Defendants was conditioned on non-disparagement and non-disclosure. Exhibit 12. This was again reflected in the "proposed release"

emailed on Friday, August 7, 2015. Exhibit 4:33.1,33.2. Ms. Hunt accepted the offer. *See* Facts 1-3 above; Exhibits 1-3 above; Exhibit 4:29,32.

10.    **Disparagement By Ms. Hunt.** By late July 2015, Susan Hunt had regularly and publicly disparaged Defendants on social media. On July 31, 2015, during the heart of the settlement negotiations, Susan Hunt Facebooked "My son Darrien Hunt was Murdered by police Corporal Matt Schauerhamer ... The Entire City employees ... are helping to cover it up." And "[s]adly, the only good cop, in my eyes, is a dead one." Exhibit 10 (original punctuation, capitalization, etc.). This disparagement risked destroying settlement chances. Exhibits 12; 4:28 ¶¶ 1,2. Mr. Sykes and Ms. Hunt discussed this extensively on August 3, 2015, and thereafter. Exhibits 12; 4:34, 34(a)¶1, 35. Ms. Porter was told on August 3rd that settlement was contingent on non-disparagement provisions, and reported this to Mr. Sykes that same day. Exhibits 12; 4:41 (last ¶). This was immediately relayed to Susan Hunt. Exhibit 12. After Mr. Sykes tried to lessen or weaken the non-disparagement (Exhibit 4:34(a)), Ms. Porter reported back on August 12, 2015 that the Sykes-proposed changes in the Release (Exhibit 4:34(a)) would "eliminate the non-disparagement provisions that we know the City deems important. Your client might have to **make a choice: 1) Write a book,** make public statements, etc., which requires proceeding with the litigation, trial, and appeal, or **2) accept a settlement** and start healing at this time. I don't think she can have both." Exhibit 4:41, last ¶. Within an hour, Mr. Sykes forwarded this email to Susan Hunt (Exhibit 42(a)) and reframed the "choice" as either say what you want to say, or settle. Exhibit 2, 4:42 (emphasis added).

11.    **Release with Non-disparagement Forwarded to Hunt.** As part of the proposed settlement, Defendants prepared and submitted a Release to both Hunts, through their

respective counsel. The Release included a strong "non-disparagement clause" several paragraphs long. Exhibit 4:33.1,33.2 ¶¶ 5,6,7,8,9. Part of the non-disparagement required that public comment was to be limited to a press release. *Id.* ¶¶ 7,8. On Friday, August 7, and on Monday, August 10, 2015, Susan Hunt was sent a copy of the proposed Release, along with a letter which suggested changes to Heather White, who represented Saratoga Springs. *See* Exhibit 4:34,34(a),35. [Note: the original electronic settlement documents included automatic date codes that update the month to the day the document is opened. The originals had an August date, but that month was automatically changed to October when they were opened.]

      12.    **Non-Disparagement to Be Reviewed with Susan Hunt.** A response was made to Karra Porter's email of "action items," including non-disparagement, and copied to Susan Hunt, on August 12th at 4:41 pm. Mr. Sykes indicated that he must first review certain points with Ms. Hunt. Exhibit 4:44,¶¶ 2,3 ("will run this by Susan," will "review this with Susan").

      13.    **Choice: "Say What You Want" – or Settle.** Ms. Hunt was told in the August 12, 2015 - 3:41 pm email that "It will probably boil down to (1) whether you want the *freedom to say what you want to say,* with no restrictions, or (2) whether you want to settle and *get the money."* Exhibit 2 (emphasis added).

      14.    **Non-disparagement Was the Main Issue.** That same email stated "[t]he main issue here is the 'non-disparagement provision.'" Exhibit 2.

      15.    **Ms. Hunt Approves Release and Non-disparagement.** On August 12, 2015, at 5:06 pm, less than one (1) hour after sending Ms. Hunt the proposed Release with the non-disparagement clause, Mr. Sykes talked with Susan Hunt for approximately 20 minutes about "all aspects" of the Release and the non-disparagement provisions. Then, with Ms. Hunt's approval, he

recorded her specific acceptance to the Release and the non-disparagement. *See* Exhibit 3 and 4:45.
In that conversation, Sykes told Hunt, ***"I have told you that the non-disparagement clause is a deal
breaker for them and you told me that it was okay, you would go ahead and sign it with that
clause in there, right?"*** Susan Hunt answered, ***"Yeah."*** Mr. Sykes responded, "Okay, is that a
yes?" To which Susan Hunt responded, ***"Yes."*** *Id.* (emphasis added).

        16.    **Press Releases Are Part of Non-disparagement.** The "press releases" were
proposed in conjunction with, and an integral part of, the non-disparagement clause as the means by
which both the Plaintiffs and Defendants would communicate to the press about the settlement in
a non-disparaging way. *See* Exhibit 4:33.2, Release ¶¶5,9,pp.1-2. The original Release on August
17 provided in this regard: "Claimants and Releasees agree they will make no public statements
other than those contained in the Press Releases attached as Exhibits 1 and 2 ...." Exhibit 4:33¶8.
The final Release sent on August 18, 2015, to Susan Hunt for her signature has the identical
language. Exhibit 5.

        17.    **Ms. Hunt Was Prepared to Sign on 8/12/15.** In that same phone call on
August 12, 2015, at 5:06 pm, Mr. Sykes asked Ms. Hunt, "We should be able to sign a deal
tomorrow or Monday [8/17/15]. Are you available tomorrow [8/13/15] to come down if we need
[you] to?" Hunt responded, "Uh, yes, I am." Exhibits 3, 4:45.

        18.    **Communications Through Karra Porter to Heather White.** During the
settlement negotiations in the period June – mid-August 2015, many of the oral communications
between Plaintiffs and Defendants were made or occurred between Karra Porter and Heather White
directly. Exhibits 1; 4:20, 28 ¶1, 29, 30, 32, 33 and 44; and Exhibit 12.

19. **Defendants Declined to Make Suggested Changes.** Susan Hunt participated in, and knew about, suggested changes in the Release, specifically non-disparagement. Exhibits 4:34, 34(a), 35 and 42. Defendants categorically declined to make suggested changes that would weaken the non-disparagement agreement. Exhibit 4:48, responding to Exhibit 4:34(a).

20. **Settlement Was Final as of 8/12/15.** After Ms. Hunt accepted the Release with the non-disparagement provision on 8/12/15 at 5:06 pm, which was then communicated to Heather White for Defendants, the settlement was final as to all material facts insofar as Susan Hunt was concerned. Plaintiffs and Defendants had agreed on: (1) the settlement amount of $900,000 (Exhibit 1); (2) the principle of non-disparagement (Exhibits 2, 3); and (3) a full Release with the non-disparagement provisions included, including the principle of press releases. Exhibits 3, 4:45. As part of the non-disparagement, the parties agreed to speak through very general Press Releases to be prepared by Heather White, with input from Karra Porter and Mr. Sykes. Exhibit 4:33.2 (Release ¶7,8) and Exhibits 3, 4:45 (8/12/15 - 5:06 pm conversation).

21. **Dividing the Money with Curtis Hunt.** After agreeing to the settlement with Defendants, the conversation between Ms. Hunt and Mr. Hunt and their respective counsel turned to how to divide the $900,000 settlement money between Ms. Hunt and Mr. Hunt, pursuant to their agreement to arbitrate. Exhibit 4:46,47. On Friday, August 14, 2015, at 11:34 pm, Ms. Hunt emailed Mr. Sykes approximately 2½ pages of information about Curtis Hunt's alleged relationship with his son, Darrien, in anticipation of a pre-agreed arbitration over how to divide the settlement proceeds between Curtis Hunt and Susan Hunt. *See* Exhibit 4:51 (content redacted for privacy).

22. **Minor Changes in Ms. Hunt's Favor.** During the period between approximately Thursday, August 13, 2015, and early Tuesday afternoon, August 18, Ms. White made

minor, non-material changes to the final documents, mostly at the request of Ms. Porter and Mr. Sykes, and largely in favor of Ms. Hunt. For example, a provision allowing Ms. Hunt to retrieve Darrien's property (cell phone, clothing, sword) was inserted. Exhibit 4:48,53. Other minor changes were made, such as referring to Defendants as "the officers," rather than by given names. Exhibit 4:55¶¶2-4; Exhibit 5, final version of the Release. [Note: earlier drafts sent to Susan Hunt are found in Exhibit 4:33.2 and are substantially identical.]

      23.    **Final Documents Sent on August 18.** On Monday, August 17, and Tuesday, August 18, various drafts of the final Release and Press Releases were sent back and forth between counsel. *See* Exhibit 4:55,59,60,60.1,61,62. These settlement documents, and all other emails during this and all previous days, were forwarded to Susan Hunt from Mr. Sykes. At 10:18 a.m. on August 18, Heather White emailed that she was working through "the last issues on the proposed press releases," which she hoped to get to Mr. Sykes and Ms. Porter "today." Exhibit 4:53. The final signature-ready documents were forwarded to Ms. Hunt on August 18 by Mr. Sykes from his iPhone (Sykes was in Idaho on another case) at approximately 3:18 p.m. Exhibit 4:59. A few minor, non-material changes were made thereafter to the press releases. Exhibit 4:60,60.1,61,62,65,66. The final versions were sent to the City for signature at 5:23 p.m. Exhibit 4:63.

      24.    **White Requests Tax ID Number and Check Payable Info.** Ms. White asked for the SMLO Tax ID number and "how to make the settlement check payable." Exhibit 4:53,56.

      25.    **"Can [I] Afford a House for 250,000?"** On Tuesday, August 18, 2015, at 2:04 pm, after having received the substantially final Release, Susan Hunt texted Mr. Sykes, "Thank you for your kind words. Do you think I can afford a house for 250,000?" *See* Exhibit 4:57.

x

26.  **Final Release Sent at 3:18 pm.**  The final Release with press releases, ready for signature, was sent to Susan Hunt on August 18, 2015 at 3:18 p.m.  Exhibit 4:59; 4:66(a).

27.  **Release Sent to City to Sign; Settlement Check Ordered.**  At 5:23 p.m., Heather White emailed Mr. Sykes and Ms. Porter that she had just sent the Release to the City Manager to sign for the City, and had ordered the settlement check.  Exhibit 4:63.

28.  **Check Being Overnighted.**  On Wednesday, August 19 at 4:41 p.m., Mr. Sykes notified Susan Hunt that the check was being overnighted.  Exhibit 4:66(b).

29.  **August 20 - Will Not Sign Without "Advisory Council."**  On Thursday, August 20, 2015, at 11:51 am, Susan Hunt sent an email to Mr. Sykes addressed "To whom this concerns," and indicated that she would "not sign this b_ _ _ _ _ _ t document releasing Saratoga Springs and the murdering cops, until I hear back from my advisory counsel and Jonathan Moore, Eric Garner's attorney."  Exhibit 4:67.

30.  **Defamatory and Vile Facebook Posts and Tweets.**  Susan Hunt has regularly posted false and defamatory claims about Robert Sykes and his law firm on Facebook and Twitter.  *See* Exhibit 10 for a sampling.

## ARGUMENT

## POINT I

### ~ Rules of Professional Conduct Allow Disclosure ~

**THE RULES OF PROFESSIONAL CONDUCT AND CASE LAW PERMIT MR. SYKES AND SMLO TO REVEAL FORMERLY CONFIDENTIAL INFORMATION RELATING TO THE REPRESENTATION IN (1) FEE DISPUTES AND (2) IN DEFENSE TO CLAIMS OF ATTORNEY MISCONDUCT.**

**A. Disclosures in Fee Disputes and Misconduct Claims.** Rule 1.6, Utah R. Prof'l Conduct (URPC), addresses "Confidentiality of Information." It provides, generally, that a lawyer shall not "reveal information relating to the representation of a client" without the client's informed consent unless the disclosure is "permitted by paragraph (b)." Subparagraph (b)(5) is broad. It reads:

> A lawyer may reveal information relating to the representation of a client *to the extent the lawyer reasonably believes necessary: ... to establish a claim* or defense on behalf of the lawyer in a controversy between the lawyer and the client, ... or to *respond to allegations* in any proceeding concerning the lawyer's representation of the client; ....

Rule 1.6(b)(5), URPC (2005) (emphasis added). Thus, the Rule specifically allows disclosure of confidential information in fee disputes and in claims of attorney misconduct.

> As to fee disputes, a Comment provides:

> A lawyer entitled to a fee is permitted by paragraph (b)(5) *to prove the services* rendered in an action to collect it. This aspect of the rule expresses the principle that the *beneficiary of a fiduciary relationship may not exploit it to the detriment of the fiduciary.*

Rule 1.6, URPC, Cmt. 11 (emphasis added). This comment fits the current situation precisely. SMLO and Hunt are involved in a fee dispute, and SMLO must be allowed to reveal client

1

information in order to "prove the services rendered" in this proceeding to collect the fee. Additionally, this Rule endorses the principle that Ms. Hunt may not "exploit" the fiduciary relationship to the detriment of the fiduciary, SMLO.

Rule 1.6(b)(5) likewise permits disclosure "to respond to allegations ... concerning the lawyer's representation of the client." The Opposition [Doc 24] filed by Susan Hunt contains numerous allegations of malpractice, ineffective assistance of counsel, fraud, disloyalty and even an intimation of criminal conduct, to name a few. Press interviews by Susan Hunt allege possible disbarrable misconduct by Mr. Sykes. Exhibit 9. Social media posts made or instigated by Susan Hunt make horrible allegations of perfidy and a variety of misconduct. Fact 30 and Exhibit 10.

Utah and non-Utah case law support the proposition that SMLO may disclose confidential communications to respond to allegations of misconduct. *See* below.

**B.**     **Attorney's Lien Is Broad and Unrestrained at Law.** The attorney's lien statute is broad and robust. Among other things, an attorney's lien "is not restrained by law." Utah Code Ann. § 38-2-7(1). The "lien commences at the time of employment of the attorney by the client," well before money is obtained in a contingent fee civil rights case. § 38-2-7(3). An attorney may "enforce a lien under this section by ... moving to intervene in a pending legal action." § 38-2-7(4)(a). Any other person takes an interest in the property "subject to the attorney's lien." § 38-2-7(8).

Because an attorney's lien is broad and "not restrained by law," the URPC should not be viewed as restricting attorney disclosure of confidential information in pursuit of the lien or in response to claims of attorney misconduct.

C.   **Utah Case Law Supports Sykes and SMLO.**   Utah case law supports the proposition that Rule 1.6, URPC, allows broad disclosure of information relating to (1) a fee dispute, (2) attorney misconduct, and (3) matters "generally known."  In *Spratley v. State Farm Mut. Auto. Ins. Co.,* 2003 UT 39, 78 P.3d 603, defendant State Farm raised both Rules 1.9 and 1.6, URPC, as a defense to an employment claim by an attorney against State Farm.  The Court engaged in a lengthy discussion of Rules 1.9 and 1.6.  Under the subtitle "Duty of Confidentiality to Former Client," the Utah Supreme Court noted:

> Rule 1.9 of the Utah Rules of Professional Conduct prohibits an attorney from using information relating to his prior representation of a client "to the disadvantage of the former client." Utah R. Prof'l Conduct 1.9(b). ***Exceptions exist to this rule for circumstances allowed in Rule 1.6 or when the information becomes "generally known."***

*Spratley,* ¶14 (emphasis added).

Application of the "**generally known**" Rule in *Spratley* to the instant case is clear on three fronts. *First,* by "publishing" two lengthy, detailed and scandalous Oppositions on October 13, 2015 (Docs. 23 and 24), Susan Hunt has waived any confidentiality about the matters that she chose to make public, because it is now "generally known" information. *Second,* "generally known" is also proven by the extensive press reports and interviews given by Susan Hunt.  Therein, she claims *inter alia* that Mr. Sykes settled the case without her approval and, in fact, contrary to her express instructions. *See* Exhibit 9, various press reports. *Third, see also* a sampling of some of the rather vicious tweets and Facebook posts either posted, instigated or re-tweeted by Susan Hunt, Exhibit 9.  Susan Hunt is promoting defamatory "tweets" on her twitter account "@susaa63" and on Facebook.  The tweets are directed at Mr. Sykes's twitter account "@rbsalaw."  These tweets are defamatory, abusive, state false information, and in one case threaten Mr. Sykes directly in the form

3

of a "voodoo doll." Further, it appears that Ms. Hunt is giving false information to her friends on

social media and having them defame and threaten Mr. Sykes as well. *See* Exhibit 10. All of this

information has become "generally known," and thereby waives the privilege of confidentiality.

Additionally, Rule 1.6 explicitly allows **disclosure in fee disputes** and where

necessary to establish "a claim or defense" by a lawyer in a controversy ("respond to allegations")

with the client. Severe **allegations of misconduct** have been leveled by Ms. Hunt against Mr. Sykes,

and thus we have not only a fee controversy, but a misconduct controversy. In *Spratley,* the Court

explained Rule 1.6 in fee disputes and misconduct contexts:

> Of the exceptions found in Rule 1.6, only one has any potential application to the
> facts of this case. The applicable exception allows disclosure "to the extent the
> lawyer reasonably believes necessary ... [such as] ... [t]o *establish a claim or defense
> on behalf of the lawyer* in a controversy" between the lawyer and the client." Utah
> R. Prof'l Conduct 1.6(b)(3). Thus, if Spratley and Pearce's suit *represents a "claim"*
> within the meaning of Rule 1.6, *they may make disclosures if they are reasonably
> necessary to that claim.*

*Spratley,* ¶15 (emphasis added). Susan Hunt makes "the claim," *inter alia* with other misconduct

claims, that SMLO settled the case without her approval. This is highly defamatory for a lawyer.

SMLO responds that a fee is owed because Susan Hunt agreed to the settlement. Ms. Hunt claims

that SMLO is guilty of pervasive misconduct and dishonesty. Mr. Sykes responds that the charges

are false, in their entirety. It is, therefore, "reasonably necessary" for SMLO to disclose confidential

information and communications between Susan Hunt and Robert Sykes, as "necessary to that

claim." Disclosure is also necessary to address the now "generally known" "controversy between

the lawyer and the client" regarding instructions to settle the case and the claims of misconduct.

**D.    Rule 1.6 in Non-Utah Cases Support Sykes.**    Non-Utah cases support

allowing confidential disclosures under these circumstances. In *Heckman v. Zurich Holding Co. of*

*America,* 242 F.R.D. 606 (D. Kan. 2007), a research attorney hired to perform tax work brought suit

against the insurance company alleging retaliatory discharge and defamation under Kansas law. The

lawyers sought to make confidential disclosures in support of the suit.  The defendants responded

that disclosure was not allowed, alleging "the claim or defense exception ***contemplates only fee***

***disputes*** between a lawyer and her client." *Heckman,* 242 F.R.D. at 610 (emphasis added).  The

court also noted that the principle expressed in the equivalent of Utah's Comment 11 means that "a

client should not be permitted to exploit an attorney's fiduciary duty," and that applies "beyond mere

fee disputes." *Id.* at 611.

      *Heckman* did <u>not</u> involve a fee dispute.  However, the discussion in the case over a

couple of pages makes it very clear, and both sides actually agreed, that Rule 1.6 definitely applies

to "fee disputes," where confidentiality is waived and of no legal effect.  The attorney is clearly free

to disclose what the attorney "reasonably believes necessary" to collect his/her fee. *Heckman,* 242

F.R.D. at 610.

      Other cases have reached similar results.  *See, Reilly v. Greenwald & Hoffman, LLP,*

196 Cal. App. 4th 891, 900 (Cal. App. 4th 2011) (an allegation of legal malpractice waives

attorney-client privilege; due process right to defend against the claim is violated in absence of

ability to disclose information [applying the common law self-defense exception to attorney-client

privilege; California has not adopted the RPC]); *Squire, Sanders, & Dempsey LLP v. Givaudan*

*Flavors Corp.*, 937 N.E.2d 542, 543-544 (Ohio 2010) (suit for unpaid legal fees, counter-suit for

malpractice; recognizing the "self-protection exception" to the attorney-client privilege; Ohio RPC

1.6(b)(5) permits an attorney to prove legal services rendered and to respond to allegations of

misconduct by the client); *Dana v. Piper,* 295 P.3d 305, ¶26 (Wash. App. 2013) (client impliedly

waives privilege with respect to the defendant attorney); and *Pedersen & Houpt v. Summit Real Estate Group, LLC,* 877 N.E.2d 49 (Ill. App. 2007) (Illinois RPC 1.6 permits attorneys to use confidential information to pursue other legal theories, if solely for the purpose of retrieving fees and costs).

**POINT II**

**~ Susan Hunt Agreed to Settle ~**

**THE PARTIES WERE ENGAGED IN SETTLEMENT NEGOTIATIONS FOR TWO MONTHS, DURING WHICH TIME SUSAN HUNT WAS REGULARLY CONSULTED AND AFFIRMATIVELY AND CONSISTENTLY AGREED TO THE PROPOSED SETTLEMENT. HER ACTIONS WERE ALSO CONSISTENT WITH A MENTAL STATE OF HAVING SETTLED.**

A.  **Settlement Discussed Throughout the Case.**  Settlement in this case was broached from the very beginning, with the approval of Susan Hunt.  There were three (3) early settlement letters in 2014 addressed to Heather White and Christopher Duffy, an adjuster for the Utah Local Governments Trust.  These were copied to Susan Hunt.  *See* Exhibit 6.

When early settlement was declined by Defendants, a lengthy Complaint was filed on January 2, 2015. Doc. 2.  The Complaint had about 174 factual allegations.  Defendants' Answer (Doc. 5) did not respond to the facts or allegations, so Plaintiffs moved to compel (Doc. 7) a specific response to those facts which Plaintiffs deemed important.  On May 14, 2015, Magistrate Judge Warner denied the motion.  Doc. 12.

B.  **Mediation Occurred.**  Sometime in late May 2015, Heather White broached the possibility of a mediation with Karra Porter, counsel for Curtis Hunt.  A mediation was eventually scheduled for Thursday, June 18, 2015, at the offices of Christensen & Jensen, with Paul

Felt as the mediator.  Fact 8.  Susan Hunt was present at the mediation, with both of her sisters, who served as advisors at her request.  *Id.*  The case did not settle at mediation, and the mediation terminated.

        **C.**     **Continued Negotiations.**  Settlement negotiations continued through the rest of June and July 2015.  Exhibit 4:6.1,6.2,7,15-17,21.  Several offers were exchanged.  Fact 8.

        Because of ongoing negotiations after the mediation, Mr. Sykes and Ms. Porter wanted to have a commitment in writing from both Ms. Hunt and Mr. Hunt as to the amount that they would take to settle the case.  The settlement negotiations had always been conducted in terms of agreeing on a global amount for both Hunts to settle.  Ms. White had communicated that Defendants would <u>not pay</u> $1,000,000, but <u>would pay</u> "something less than that."  Exhibit 4:6.2. Susan Hunt and Curtis Hunt thereafter agreed that, if Defendants would offer it, they would jointly take $850,000-$900,000.  Susan Hunt confirmed her acceptance of this amount in the email of July 8, 2015, wherein she stated, "Hi Bob, I reluctantly ***will accept 850,000 to 900,000.*** Please push for as close to 1 mil as possible.  Thank you, kindly, Susan Hunt."  Exhibits 1, 4:6 (emphasis added).

        The negotiations for a settlement amount with Defendants continued through July. Five days after Susan Hunt had agreed to accept the $850,000-$900,000 amount if offered by Defendants, Plaintiffs emailed Defendants and said that they "would like to take another run at getting this resolved before we get heavily involved in serious and lengthy litigation."  Exhibit 4:6.2 (email of 7/13/15 at 7:29 pm).  Heather White's statement noted in that email "that a number between $750,000 and $1,000,000 might be acceptable to both sides."  *Id.*  It further indicated that Susan Hunt's counsel could get her to take a number under $1,000,000 "if the number was right."

*Id.* This email, as with all emails regarding settlement, were blind-copied or forwarded to Susan Hunt. Exhibit 4:21,30.

D.    **Offer to Settle for $900,000 & Acceptance.**  On August 3, 2015, Defendants confirmed a conditional $900,000 offer to settle. This was communicated orally to Susan Hunt on August 3rd (Exhibit 12), who by earlier email had accepted the $900,000 amount. Fact 1 and Exhibit 1. This acceptance of $900,000 was relayed to Defendants and, as a result, Ms. White prepared a Release on August 7th with $900,000 as the settlement amount. Exhibit 4:33.1; Fact 11.

E.    **Proposed Release with Non-Disparagement Provisions.**    On Friday, August 7, at 5:07 pm, Heather White emailed "the proposed Release we have prepared." She indicated that she would be working "on language for a proposed press release next week. Please let me know Monday any comments to the release." The proposed Release included not only a $900,000 settlement amount, but strong non-disparagement provisions. Exhibit 4:33.1-33.2 (5 pages). This was also forwarded to Susan Hunt. Exhibit 4:34.

This Release resulted in discussions about non-disparagement with Susan Hunt over that weekend. These discussions prompted the preparation of a letter by Mr. Sykes on August 10, 2015, directed to Heather White, to try to soften or remove some of the non-disparagement restrictions. This letter requested four additional paragraphs to meet Susan Hunt's concerns. *See* Exhibit 4:34(a), letter of August 10, 2015, suggesting changes in the Release, ¶¶ 9-13. These changes were firmly rejected by Heather White on behalf of the Defendants. Facts 11-15; Exhibit 5.

F.    **Either/Or on Non-Disparagement.**  In the discussions with Susan Hunt, it was made very clear that she had a choice to either accept the Release with the non-disparagement clause and the press releases, or to not accept, and have the "freedom to say what you want." Facts

8

1, 2, 3; Exhibits 1, 2, 3. **Either, or.** It was put to her very bluntly in that email of August 12, 2015, at 3:41 pm. Exhibit 2.

        G.    **Acceptance By Susan Hunt.**  Within two hours of sending that email on August 12th, Robert Sykes and Susan Hunt had a lengthy conversation, lasting about 20 minutes, where they discussed all aspects of the Release, the non-disparagement provisions, and the press release by which she would have to be bound. Facts 15, 16, 17 and 19. Susan Hunt was told that Defendants categorically declined to make changes to the non-disparagement provisions. Exhibits 2, 3, and 4:48. So, Susan Hunt accepted these non-disparagement restrictions, unconditionally. Fact 3; Exhibit 3. We have a recording.

        In summary, there is no question that Susan Hunt accepted, with eyes wide open, all material aspects of this settlement as of August 12th. This included the $900,000 offer, clearly set forth in all drafts of the Release, as well as non-disparagement and the press releases.

        Further evidence of acceptance by Ms. Hunt is her asking on August 18th at 2:02 pm if she would have enough money for a $250,000 house. Fact 25. She had mentally accepted the settlement and had "moved on," so to speak.

**POINT III**

**~ Hunt Gave Sykes Authority to Communicate the Settlement ~**

**SUSAN HUNT EXPRESSLY GAVE HER ATTORNEY, ROBERT SYKES, AUTHORITY TO COMMUNICATE ACCEPTANCE OF SETTLEMENT OF THE CASE TO DEFENDANTS.**

        In the days following August 12th, Susan Hunt and Curtis Hunt had a few minor, non-material requests for inclusion into the Release, most of which were agreed to by Heather White. Fact 22. These included such things as help with retrieving Darrien's property that was still in the

9

custody of the police.  However, as of August 12, 2015 at 5:06 pm, Ms. Hunt had agreed to sign "tomorrow" or "Monday."  Exhibit 3; Facts 15, 17.  This was communicated to Heather White. Exhibit 4:48, 52, 53, 54, 55, 56, 58 and 61.  Heather White then requested and was provided tax ID info, bank account info, name on the check info, etc.  *Id.*

Susan Hunt's agreement to settle as of August 12, 2015, is also confirmed by other facts.  For example, Ms. Hunt and Mr. Sykes immediately (August 14) began working on preparing for the Curtis Hunt arbitration, contemplated to take place shortly, whereby there would be a division of the settlement proceeds between Curtis and Susan Hunt.  Exhibit 4:51.  Ms. Hunt sent information to use re: Curtis Hunt's relationship with Darrien.  In other words, she had already accepted the settlement in her mind, and had moved on to the division of the proceeds with Curtis, the next major issue in the case.  *Id.*

## POINT IV

### ~ Lien Applies to Offer ~

**THE ATTORNEY'S LIEN IN THIS CASE APPLIES TO ANY OFFER, AND NOT JUST A SETTLEMENT.**

The redacted Retainer Agreement is attached as Exhibit 11.  It provides that "[i]f Firm withdraws or is dismissed by Client, Firm will file a lien on the case for fees [in the amount of] ... 40% of any settlement offer received by Firm ... <u>and</u> costs."  Exhibit 11, ¶5 (brackets added; underline in original).  In this case the Firm secured an offer of $900,000, and the lien is on that sum. Even if the Court denies enforcement of the settlement, the lien should remain in place.

## CONCLUSION

Written and recorded evidence confirms that Susan Hunt agreed to settle the case for $900,000, as evidenced by an email and the Releases.  Susan Hunt also agreed to the robust non-disparagement provisions, as demanded by Defendants as a condition of settlement.  Lastly, Ms. Hunt gave authority to her attorney, Robert B. Sykes, to communicate acceptance of the settlement to Defendants, as shown, *inter alia,* by her willingness to sign the settlement documents immediately.

The Attorney's Lien is valid and allowed by law.  It is justly and fairly asserted in this case. The Court should issue all related Orders necessary to uphold the Attorney's Lien.

DATED this 10th day of November, 2015.

ROBERT B. SYKES

11

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of November, 2015, I served the foregoing **Response to Susan Hunt's Opposition to Attorney's Lien** (which was filed conventionally on this same date with the court) electronically via email to all attorneys of record as follows:

Heather S. White
hsw@scmlaw.com

R. Scott Young
sy@scmlaw.com

Karra J. Porter
karra.porter@chrisjen.com

Scott T. Evans
scott.evans@chrisjen.com

Rachel L. Sykes
rachel@sykesmcallisterlaw.com

Paul Lydolph, III
paul@lydolphlaw.com

Shean DeCarlos Williams
swilliams@cochranfirmatl.com

Samuel L. Starks
sstarks@cochranfirmatl.com

151110.Response to Opp to Atty Lien.wpd