IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| SUSAN HUNT, mother and personal representative of DARRIEN HUNT, deceased; CURTIS HUNT; and ESTATE OF DARRIEN HUNT, by its Personal Representative Susan Hunt,<br><br>　　　　　　Plaintiffs,<br><br>vs.<br><br>MATTHEW L. SCHAUERHAMER; NICHOLAS E. JUDSON; and the CITY OF SARATOGA SPRINGS, UTAH,<br><br>　　　　　　Defendants. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br><br>Case No. 2:15-CV-1-TC-PMW |

At the beginning of 2015, Plaintiff Susan Hunt filed this 42 U.S.C. § 1983 civil rights action against the City of Saratoga Springs and two of its police officers (collectively, Defendants) in connection with the 2013 shooting death of Darrien Hunt, the son of Susan and Curtis Hunt. Ms. Hunt, along with Darrien's father, began settlement negotiations with the Defendants. In August 2015, the parties agreed to settle the case for $900,000. But on September 10, 2015, Ms. Hunt announced to the media that she had turned down the $900,000 offer.

Defendants then filed a motion to enforce that $900,000 settlement,[1] contending that Ms.

---

[1] See ECF No. 17.

Hunt accepted the offer through her attorney and is bound by the terms of the agreement. In their motion, Defendants ask the court to order Ms. Hunt to reimburse Defendants for attorney's fees incurred in their efforts to enforce the settlement.

For the reasons set forth below, the court grants the Defendants' request to enforce the settlement agreement against Ms. Hunt but denies Defendants' request for attorney's fees.

## FACTUAL BACKGROUND[2]

**Summary of Events**

On September 10, 2013, Darrien Hunt was pursued by City of Saratoga Springs police officers, shot, and killed. Susan Hunt hired attorney Robert Sykes of Sykes McAllister Law Officers, PLLC, who filed a civil rights complaint on her behalf (Ms. Hunt sued as an individual and as the representative of Darrien Hunt's estate). Curtis Hunt joined in the suit but was represented by a different attorney.

After the complaint was filed, the parties entered into settlement negotiations. During the summer of 2015, the parties drafted a settlement agreement in which the Defendants agreed to

---

[2] At the court's January 19, 2016 hearing on the motion to enforce the settlement, Ms. Hunt's counsel requested that Ms. Hunt be permitted to testify on the stand. "[W]here material facts concerning the existence or terms of an agreement to settle are in dispute, the parties must be allowed an evidentiary hearing." United States v. Hardage, 982 F.2d 982 F.2d 1491, 1496 (10th Cir. 1993). The court denied Ms. Hunt's request because the record did not create any dispute of material facts. See Nature's Sunshine Products v. Sunrider Corp., 511 F. App'x 710, 714 n.3 (10th Cir. 2013) ("Nature's Sunshine II") (holding that because material facts were not in dispute, the only issue was the "legal significance" of those facts and an evidentiary hearing was not necessary). Ms. Hunt had the opportunity to submit an affidavit at any point during the briefing, which included three supplemental briefs. But she did not submit one. Instead, Ms. Hunt relied on documentary evidence and unsupported conclusory statements. The evidence establishing the material facts (whether and when an agreement had been reached and whether Mr. Sykes had authority to bind Ms. Hunt to that agreement) was not contradicted.

pay the Plaintiffs $900,000 in exchange for a release of further liability (accompanied by a press release) and a non-disparagement clause.

But Ms. Hunt contends she never agreed to the settlement terms.  On September 10, 2015, she repudiated the agreement in a statement to the media.  According to an article published in The Salt Lake Tribune, Ms. Hunt announced that "she declined a $900,000 civil settlement with the City of Saratoga Springs and the two officers who shot her son, saying she would have been required to stay quiet about the incident."  <u>Mom of Darrien Hunt Says She Rejected $900K Settlement Offer in Son's Death</u>, The Salt Lake Tribune, Sept. 10, 2015 (Ex. A to ECF No. 47).  That was the first time Defendants had notice that Ms. Hunt did not intend to fulfill her obligations under the settlement agreement.

The following time line sets forth in detail the communications that led to the settlement agreement.

**Time Line of Events**

After the complaint was filed in January 2015, Mr. Sykes represented Ms. Hunt in mediation with the Defendants.  The mediation was not successful.  But the parties decided to re-open settlement negotiations.

*July 8, 2015*

On July 8, 2015, Ms. Hunt emailed Mr. Sykes:

> Hi Bob,
> I reluctantly will accept 850,000 to 900,000. Please push for as
> close to 1 mil as possible.  Thank you,
> Kindly,

Susan Hunt.[3]

*July 23, 2015*

Five days later, Mr. Sykes emailed Defendants' counsel, stating that he and Curtis Hunt's counsel "would like to take another run at getting this case resolved before we get heavily involved in serious and lengthy litigation."[4]

*August 7, 2015*

After some negotiation, the parties agreed on a settlement amount of $900,000 and Defendants' counsel drafted a Release of All Claims, which was emailed to Mr. Sykes on August 7, 2015.[5] In addition, due to the publicity surrounding the lawsuit, the parties began working on respective press releases (to be mutually agreed upon) to publicize the settlement upon entry of an order of dismissal.

*August 12, 2015*

On August 12, 2015, Ms. Hunt and Mr. Sykes had a telephone conversation (Mr. Sykes recorded and transcribed the conversation).[6] In that phone call, the two discuss the amount of settlement and the nondisparagement clause, and Ms. Hunt agreed to the settlement:

> Bob:   It's the 12th of August, 2015. It's 5:06 p.m. We've been talking for about 15 or 20 minutes about all aspects of the case. And I wanted you to repeat [it] so I have a record of it, not to email me. I've told you that the nondisparagement clause is a deal breaker for them

---

[3] July 8, 2015 Email, 1:39 p.m., Ex. U to ECF No. 52.

[4] July 13, 2015 Email, 7:29 p.m., Ex. B to ECF No. 52.

[5] See Aug. 8, 2015 Email, 5:07 p.m., Ex. C to ECF No. 52.

[6] The court issued an order holding that Ms. Hunt waived her attorney-client privilege. See Jan. 6, 2016 Order & Mem. Decision (ECF No. 68).

        and you told me that it was okay, you would go ahead and sign it with that clause in there, right?

Susan:  Yeah.

Bob:  Okay, that's a yeah?

Susan:  Yes.

Bob:  Say it louder.

Susan:  I will sign. Yes.
. . . .

Bob:  … But, we should be able to sign a deal tomorrow or Monday. Are you available tomorrow to come down if we need [you] to?

Susan:  Uh, yes, I am.
. . . .

Bob:  In other words, you will hold your nose to sign it, right?

Susan:  Yes.

Bob:  Now don't get upset, okay? I want you to be happy. This is a good settlement. Be happy, okay?

Susan:  I'm trying.[7]

*August 17, 2015*

On August 17, 2015, Mr. Sykes emailed counsel, asking, "Where are we on the final settlement documents? I would like to review them, and get my client's signature on them, shortly. Thanks."[8]

---

[7] Tr. of Aug. 12, 2015 Telephone Conversation between Susan Hunt and Mr. Sykes, Ex. X to ECF No. 52.

[8] Aug. 17, 2015 Email, 5:12 p.m., Ex. D to ECF No. 52.

*August 18, 2015*

The next day, Defendants' counsel responded, "I am working through what will hopefully be the last issues on the proposed press releases. I hope to get those to you today. In the mean time, can you and [Curtis Hunt's counsel] please get me your firm tax I.D. numbers and let me know how to make the settlement check payable? Thank you."[9] Forty minutes later, Mr. Sykes emailed Defendants' counsel with the tax I.D. number and payment instructions.[10] The payment instructions were further clarified in two additional emails from Mr. Sykes.[11]

That same afternoon, Ms. Hunt sent a text message to Mr. Sykes:

> I feel like a doormat. Thank you for your kind words. Do you think I can afford a house for 250,000?[12]

A short while later, Mr. Sykes emailed two additional edits to the press releases.[13] Defendants' counsel responded with a red-line proposal for the edits.[14] Mr. Sykes responded in an email, stating: "We agree."[15] Plaintiff Curtis Hunt's counsel also agreed to the edits in an email: "I would be ok with that."[16]

---

[9] Aug. 18, 2015 Email, 10:03 a.m., Ex. E to ECF No. 52.

[10] See Aug. 18, 2015 Email, 10:42 a.m., Ex. F to ECF No. 52.

[11] See Aug. 18, 2015 Email, 1:01 p.m., Ex. G to ECF No. 52; Aug. 18, 2015 Email, 2:54 p.m., Ex. H to ECF No. 52.

[12] Aug. 18, 2015 Text, 2:04 p.m., Ex. Y to ECF No. 52.

[13] See Aug. 18, 2015 Email, 2:37 p.m., Ex. I to ECF No. 52.

[14] See Aug. 18, 2015 Email, 3:29 p.m., Ex. J to ECF No. 52.

[15] Aug. 18, 2015 Email, 3:47 p.m., Ex. K to ECF No. 52.

[16] Aug. 18, 2015 Email, 4:13 p.m., Ex. L to ECF No. 52.

An hour later, Defendants' counsel emailed the following: "I have sent the release to the City Manager to sign for the City. I have also ordered the settlement check."[17]  Twenty minutes later, Defendants' counsel emailed again requesting one more minor change to the release, stating, "I apologize. I just received one more request for the release to [include] 'officials and officers of the City' to the definition of 'Releasees' in the first paragraph. Are you amenable to that?"[18]

Counsel for Ms. Hunt and Mr. Hunt agreed within the hour.  Mr. Sykes responded, "Yes, this is OK."[19]  Curtis Hunt's attorney also responded, saying "Agreed."[20]  At that point, the parties had agreed to all of the material terms.  The next day, Saratoga Springs City Manager Mark Christensen signed the Release.[21]

*August 20, 2015*

After the attorneys had agreed on all of the material terms, Ms. Hunt and Mr. Sykes had a series of private communications.  First, Ms. Hunt emailed the following statement to Mr. Sykes:

> To whom this concerns,
>
> I will not sign this bullshit document releasing Saratoga Springs
> and the murdering cops, until I hear back from my advisory council
> [sic] and Jonathan Moore, Eric Garners [sic] attorney on Monday.

---

[17] Aug. 18, 2015 Email, 5:23 p.m., Ex. M to ECF No. 52.

[18] Aug. 18, 2015 Email, 5:45 p.m., Ex. N to ECF No. 52.

[19] Aug. 18, 2015 Email, 5:57 p.m., Ex. O to ECF No. 52 (emphasis added).

[20] Aug. 18, 2015 Email, 6:46 p.m., Ex. P to ECF No. 52 (emphasis added).

[21] See Release, Ex. Q to ECF No. 52.  Later, on September 15, 2015, Plaintiff Curtis Hunt signed the Release. (See id.)

> Thank you,
> Susan Hunt[22]

*August 21, 2015*

On August 21, 2015, Defendants' counsel emailed Mr. Sykes: "I have the settlement check."[23] The Defendants heard nothing more from Mr. Sykes.

*August 25, 2015*

Mr. Sykes responded to Ms. Hunt's email stating that she would not sign the agreement:

> Dear Susan:
> . . . .
> I last talked with you briefly a week ago today, Tuesday, August 18th. I drove to Rexburg, Idaho that day on another case, and forwarded you various settlement documents. Judging by your emails and texts that day and since, something having to do with this has seriously offended you. You have not called me or sent any significant emails since that time, so I wanted to try to offer an olive branch and an apology, if I did something wrong.
> . . . .
> You did accept my recommendation that the case be settled for $900,000. We thereafter went forward on that, and formally accepted their offer to settle for $900,000, with your approval. All that remained was to sign the Release. We sat in my office and went through it, and again, you agreed. Apparently, you are now having second thoughts, so let me repeat a few things from the past, that I state with sincerity, in the hope that they will help you.
> . . . .
>
> Very Truly Yours,
>
> Robert B. Sykes[24]

---

[22] Aug. 20, 2015 Email, 11:51 a.m., Ex. Z to ECF No. 52.

[23] Aug. 21, 2015 Email, 12:14 p.m., Ex. R to ECF No. 52.

[24] Aug. 25, 2015 Letter, Ex. AA to ECF No. 52.

*August 28, 2015*

Three days later, Ms. Hunt fired Mr. Sykes through an email: "I'm sorry, but your services are no longer needed. Please indicate the time and location for one of my representatives to pick up the file."[25]

*September 2, 2015*

Defendants' counsel had not heard from Mr. Sykes, so she emailed again: "I thought I would check with you on the status of finalizing our settlement. Thanks."[26] Mr. Sykes did not respond. Defendants were unaware that Ms. Hunt had fired Mr. Sykes.

*September 10, 2015*

Eight days later, Ms. Hunt told the media that she had turned down the $900,000 offer to settle the lawsuit. (See <u>Mom of Darrien Hunt Says She Rejected $900K Settlement Offer in Son's Death</u>, The Salt Lake Tribune, Sept. 10, 2015 (Ex. A to ECF No. 47).

*September 30, 2015*

After hearing Ms. Hunt's declaration to the media, the Defendants filed a motion to enforce the settlement.[27] They contend that Mr. Sykes, who represented Ms. Hunt during

---

[25] Aug. 28, 2015 Email, 10:53 a.m., Ex. BB to ECF No. 52.

[26] Sep. 2, 2015 Email, 4:57 p.m., Ex. S to ECF No. 52.

[27] Curtis Hunt filed a conditional notice of non-opposition to the motion. See ECF No. 20. Mr. Hunt does not oppose the motion "based on [his] understanding that – with one exception and one clarification – the representations in the Defendants' motion are accurate." <u>Id.</u> at 1. First, he takes exception with the Defendants' characterization of what happened on September 10, 2013, when Darrien was shot. But that factual disagreement has no bearing on the issue now before the court. Second, Mr. Hunt clarifies that he "takes no position on whether [an award of attorney's fees] is legally appropriate or warranted, but notes that [the attorney's fee] portion of the Defendants' motion is directed solely at plaintiff Susan Hunt, as the Defendants have received a signed release from [Curtis Hunt]." <u>Id.</u> at 2.

settlement negotiations, had apparent, if not actual, authority to bind her to the settlement provisions and that he settled the case on her behalf. They further maintain that the agreement is valid even though Ms. Hunt did not sign the settlement papers.

## ANALYSIS

"A trial court has the power to summarily enforce a settlement agreement entered into by the litigants while the litigation is pending before it." United States v. Hardage, 982 F.2d 1491, 1496 (10th Cir. 1993). The court must apply Utah contract law to determine whether the agreement is valid and enforceable. Shoels v. Klebold, 375 F.3d 1054, 1060 (10th Cir. 2004).

Ms. Hunt contends that Mr. Sykes did not have actual or apparent authority to bind her to any settlement. She further contends that even if Mr. Sykes had authority, no contract was formed because there was no meeting of the minds on material terms of the agreement (that is, the nondisparagement clause and the release (with the accompanying press release).

**Mr. Sykes had authority to bind Ms. Hunt to the settlement agreement.**

1. Actual Authority

Mr. Sykes had actual authority to enter into the Agreement on Ms. Hunt's behalf. She hired him to file the complaint on her behalf, and she did not fire him until August 28, 2015, ten days after Mr. Sykes and the other attorneys agreed to the settlement terms on behalf of their clients. During the time that Mr. Sykes represented Ms. Hunt, they had numerous discussions about pursuing settlement, settlement terms, and acceptance of those settlement terms.

In particular, Ms. Hunt emailed Mr. Sykes on July 8, 2015, stating that "I reluctantly will accept 850,000 to 900,000. Please push for as close to 1 mil as possible." (Ex. U to ECF No. 52.) Based on this authority, Mr. Sykes emailed Defendants' counsel and stated that they "would

like to take another run at getting this case resolved." (July 13, 2015 email, Ex. V to ECF No. 52.)  The parties agreed to settle for $900,000 and Defendants' counsel emailed a Release of All Claims to Mr. Sykes on August 7, 2015.  (See Aug. 7, 2015 email, Ex. W to ECF No. 52.)

On August 12, 2015, Ms. Hunt had a telephone conversation with Mr. Sykes and agreed to the settlement:

> Bob: It's the 12th of August, 2015. It's 5:06 p.m. We've been talking for about 15 or 20 minutes about all aspects of the case. And I wanted you to repeat [it] so I have a record of it, not to email me. I've told you that the nondisparagement clause is a deal breaker for them and you told me that it was okay, you would go ahead and sign it with that clause in there, right?
>
> Susan: Yeah.
>
> Bob: Okay, that's a yeah?
>
> Susan: Yes.
>
> Bob: Say it louder.
>
> Susan: I will sign. Yes.
> . . . .
>
> Bob: … But, we should be able to sign a deal tomorrow or Monday. Are you available tomorrow to come down if we need [you] to?
>
> Susan: Uh, yes, I am.
> . . . .
>
> Bob: In other words, you will hold your nose to sign it, right?
>
> Susan: Yes.
>
> Bob: Now don't get upset, okay? I want you to be happy. This is a good settlement. Be happy, okay?
>
> Susan: I'm trying.

(Tr. of Aug. 12, 2015 Telephone Conversation between Susan Hunt and Mr. Sykes, Ex. X to

11

ECF No. 52.)  Six days later, Ms. Hunt texted Mr. Sykes, asking, "Do you think I can afford a house for 250,000?"  (Aug. 18, 2015 Text, 2:04 p.m., Ex. Y to ECF No. 52.)

Ms. Hunt's conversations with Mr. Sykes demonstrate that Ms. Hunt gave Mr. Sykes authority to settle for the terms contained in the settlement agreement.

2.      Apparent Authority

Even if Mr. Sykes did not have actual authority, he had apparent authority to bind her to the negotiated terms of the settlement.  "[T]he general principle of the law of agency is that principals are bound by the acts of their agents which are within the apparent scope of the authority of the agent and a principal will not be permitted to deny such authority against innocent third parties who have relied on that authority."  Forsyth v. Pendleton, 617 P.2d 358, 360 (Utah 1980) (emphasis added).

Ms. Hunt argues that the Defendants could not have reasonably relied on Mr. Sykes' actions and statements.  The court disagrees.

Assuming Ms. Hunt had placed limitations on Mr. Sykes' authority, she did not disclose any such limitations to the Defendants.  This lack of notice to the Defendants means that she is bound by Mr. Sykes' actions.  "'Special or secret instructions or limitations upon the authority of an agent . . . must be communicated to the party with whom he or she deals, or the principal will be bound to the same extent as though they were not given.'"  Nature's Sunshine Products, Inc. v. Sunrider Corp. ("Nature's Sunshine I"), Case No. 2:09-cv-896, 2011 WL 5881767 (D. Utah Nov. 23, 2011) (emphasis added) (quoting Am. Jur. 2d Agency § 8 (2002)), aff'd, 511 F. App'x 710 (10th Cir. 2013); see also Nature's Sunshine Products v. Sunrider Corp. (Nature's Sunshine II), 511 F. App'x 710, 716 (10th Cir. 2013) ("[T]ermination of actual authority, for whatever

reason, does not terminate apparent authority unless [the] third party had notice.") (citing Restatement (Third) of Agency § 3.11 cmt. c); Omega Eng'g, Inc. v. Omega, S.A., 432 F.3d 437, 447 (2d Cir. 2005) ("No limitation of authority was communicated to any of those involved in the settlement at the relevant time" so the principal was bound the actions of its attorney).

Moreover, nothing in the evidence indicates that the Defendants had any reason to doubt Mr. Sykes' authority. It was reasonable for Defendants to participate in negotiations with the understanding that Mr. Sykes could agree to terms that would bind Ms. Hunt.

For these reasons, the court holds that Mr. Sykes had apparent authority to negotiate the settlement agreement.[28]

**The settlement agreement is binding and enforceable.**

Ms. Hunt asserts that the agreement is not binding because the parties, through their attorneys, did not finalize the release (with the accompanying press release) and the non-disparagement clause, both of which are material terms of the agreement. She also contends that the agreement is not binding because she did not sign it.

1. The parties agreed to and finalized the material terms of the settlement.

Ms. Hunt contends that no contract was formed because the parties did not reach an agreement on material terms, including the release (with the press release attached) and the non-

---

[28]Ms. Hunt claims that she should not be bound to the settlement terms because Mr. Sykes' representation of her was ineffective at best. In her opposition to the motion to enforce the settlement, she alleges "ineffective assistance of counsel, fraud, willful misconduct, conspiracy, and/or obstruction" against Mr. Sykes. (See Pl.'s Opp'n at 3 (ECF No. 23).) But Ms. Hunt's dispute with Mr. Sykes is not material to the limited issue before the court. The settlement cannot be undone even if there were evidence that Mr. Sykes exceeded his authority, committed malpractice, or committed fraud (the court makes no finding on Ms. Hunt's allegations against Mr. Sykes). Her remedy, if any, lies in a separate action against Mr. Sykes.

disparagement clause.  According to Ms. Hunt,

> Numerous emails were exchanged between the attorneys which show that they were negotiating the terms and wording of the settlement agreement, including significant issues with the wording of the press release.  Thus, for each successive email to the other party, there was a <u>series of counter offers rather than a clarification of existing terms of mutual agreement</u>.

(Pl.'s Supplemental Brief at 9 (emphasis added) (ECF No. 59).)

To the extent that the email discussions contained official counter offers, acceptance of all terms occurred on August 18, 2015, at 6:46 p.m.  When Mr. Sykes and Curtis Hunt's counsel said, respectively, "We agree" and "I would be ok with that,"[29] the agreement was formed. Nothing more needed to be done.

    2.    <u>The agreement is valid even though Ms. Hunt did not sign a written document.</u>

Once the parties settled on the material terms of the agreement, their email exchanges, even without Ms. Hunt's signature on any written documents, created an enforceable agreement.

The settlement agreement was in writing.  "[A] writing via various electronic media, such as an email exchange between the parties in which they agree to particular provisions or a recording in which the parties affirmatively state what constitutes their agreement, would satisfy [the writing] requirement."  <u>Reese v. Tingey Constr.</u>, 177 P.3d 605, 611 (Utah 2008).  The parties' email exchanges, all of which are part of the record, satisfy any writing requirement that may exist.

But in the case of a settlement, no writing is required.  So even if the agreement were not in writing, Ms. Hunt is still bound by the documented terms because an oral settlement

---

[29]<u>See</u> Aug. 18, 2015 Email, 3:47 p.m., Ex. K to ECF No. 52; Aug. 18, 2015 Email, 4:13 p.m., Ex. L to ECF No. 52.

agreement is enforceable.  "Utah law simply does not require settlement agreements to be written to be enforceable."  Zions First Nat'l Bank v. Barbara Jensen Interiors, 781 P.2d 478, 480 n.1 (Utah Ct. App. 1989) (citing Murray v. State, 737 P.2d 1000, 1001 (Utah 1987)).

Also, the fact that Ms. Hunt did not sign the agreement does not make it any less binding on her.  Lack of a signature on a written agreement "is of no legal consequence.  It is a basic and long-established principle of contract law that agreements are enforceable even though there is neither a written memorialization of that agreement nor the signatures of the parties . . . ."  Murray v. State, 737 P.2d 1000, 1001 (Utah 1987).

As Defendants note, "the facts that Ms. Hunt subsequently had reservations, refused to sign the release, and fired Mr. Sykes cannot undo the settlement."  (Defs.' Reply at 2 (ECF No. 25).)

**The Defendants are not entitled to attorney's fees.**

The Defendants ask the court to sanction Ms. Hunt by requiring her to reimburse the Defendants for attorney's fees they incurred to enforce the settlement agreement.  The Defendants do not point to any agreement or case law entitling them to attorney's fees.  Instead, the Defendants rely on the court's inherent authority as a basis for sanctions.  The court declines to exercise that authority because such an award is not equitable in this case.

**Notice of Attorney's Lien**

On September 18, 2015, Mr. Sykes filed a Notice of Attorney's Lien, claiming that Ms. Hunt owes him a contingency fee to be calculated based on Ms. Hunt's portion of the $900,000.

Ms. Hunt filed an objection to the Notice.[30]

Now that the motion to enforce is resolved, the court turns to that Notice and Ms. Hunt's objections. But before the court can address the merits of the dispute, the court must determine whether it has jurisdiction to resolve Mr. Sykes' claim, and, if so, whether this is the proper forum. If the court does take up Mr. Sykes' claim, the process for resolving the claim needs clarification.

To that end, the court orders the City of Saratoga Springs to deposit the $900,000 into the Registry of the court. The court will hold a conference with the parties to decide how to distribute the settlement funds in light of Mr. Sykes' claim of attorney's fees from those funds. After the conference, the court will issue an order finalizing the terms of distribution. In the meantime, the court directs the parties to brief the issues of jurisdiction, forum, and procedure for the court. The briefs, to be filed simultaneously, must be filed no later than two weeks from the date of this order.

* * *

## ORDER

For the foregoing reasons, the Defendants' Motion to Enforce Settlement Agreement (ECF No. 17) is GRANTED IN PART AND DENIED IN PART. Specifically, the Defendants' request to enforce the settlement is granted, but their request for attorney's fees is denied.

Defendants are directed to immediately deposit the $900,000 into the Court's Registry. Briefs on the issues concerning the Notice of Attorney's Lien (as identified above) are due no

---

[30] See ECF No. 16.

later than March 7, 2016.  The court will hold a hearing on Tuesday, March 22, 2016, at 2:00 p.m. to address the briefed issues.

    SO ORDERED this 22nd day of February, 2016.

                             BY THE COURT:

                             */s/ Tena Campbell*

                             TENA CAMPBELL
                             U.S. District Court Judge